No. 24-1364

_____

## The United States Court of Appeals
## For the Sixth Circuit

_____

**C.S.,**
**Plaintiff-Appellant**
v.
**CRAIG MCCRUMB, et al.**
**Defendants-Appellees**

_____

Appeal from the United States District Court
For the Eastern District of Michigan
The Hon. Terrence G. Berg, District Judge
Case No. 4:22-CV-10993-TGB-EAS

_____

Brief of Appellant

_____

John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA 30534
(678) 362-7650
jrm@johnmonroelaw.com

Eugene Volokh
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu

Michael F. Smith
The Smith Appellate Law
Firm
1717 Pennsylvania Ave. NW,
Ste. 1025
Washington, DC 20006
202-454 2860
smith@smithpllc.com

Attorneys for Appellant

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1364          Case Name: C.S. v. McCrumb

Name of counsel: John R. Monroe

Pursuant to 6th Cir. R. 26.1, C.S.
                                   *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

## CERTIFICATE OF SERVICE

I certify that on _____ April 26, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ John R. Monroe

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# Table of Contents

**DISCLOSURE STATEMENT** ........................................................................ **II**

**TABLE OF CONTENTS** ..............................................................................**III**

**TABLE OF CITATIONS** ..............................................................................**V**

**STATEMENT ON JURISDICTION**..........................................................**VII**

    *1.* *DISTRICT COURT JURISDICTION*……………………………………………*VII*

    *2.* *APPELLATE JURISDICTION.*……………………………………………*VII*

**STATEMENT OF THE ISSUES**..................................................................**1**

    *1.* *DID THE DISTRICT COURT REVERSIBLY ERR IN RULING THAT THE FIRST AMENDMENT DOES NOT PROTECT A PUBLIC SCHOOL STUDENT'S WEARING OF CLOTHING THAT DEPICTS FIREARMS IN A NON-VIOLENT, NON-THREATENING MANNER, BASED ON SCHOOL OFFICIALS' ATTENUATED FEARS OF POSSIBLE DISRUPTION?*…………………*1*

    *2.* *DID THE DISTRICT COURT REVERSIBLY ERR IN GRANTING THE SCHOOL OFFICIALS QUALIFIED IMMUNITY FROM AN AWARD OF DAMAGES?*…………………………………*1*

**STATEMENT OF THE CASE**......................................................................**2**

    *I.* *FACTUAL BACKGROUND*……………………………………………………*2*

    *II.* *PROCEDURAL BACKGROUND*……………………………………………*8*

**THIS APPEAL TIMELY FOLLOWED.**.....................................................**16**

**SUMMARY OF THE ARGUMENT** ............................................**16**

**ARGUMENT**........................................................................................**17**

   I.   *C.S.'s First-Amendment Protected Rights Were Violated*.............. ...*17*

     A.  *The First Amendment Protects Student Speech, Including Speech that Depicts Weapons*.......................................................................................... *17*

     B.  *The District Court Applied Rules for School-Sponsored Speech Despite Finding that School Officials Failed to Demonstrate the Hat was School-Sponsored.*.................. *23*

     C.  *Unrebutted Evidence Established that C.S.'s Purpose in Wearing the Hat Was to Express Her Well-Established Views in Support of Gun Rights and the Second Amendment.*....................................................................................... *29*

     D.  *The District Court Erroneously Watered Down C.S.'s First Amendment Protections on the Grounds That She Is an Elementary-School Student.*.............................................. *32*

   II.  *The District Court Erred in Granting Qualified Immunity*..................*34*

   III.  *The District Court Disregarded this Court's Clear Interpretation of FRCP 6(a) in Entertaining the School Officials' Untimely Summary-Judgment Motion…..*.................................................................................*36*

**CONCLUSION** .....................................................................................**38**

**CERTIFICATE OF SERVICE** .....................................................**40**

**CERTIFICATE OF COMPLIANCE**.........................................**41**

# Table of Citations
## Cases

*Curry v. Hensiner,* 513 F.3d 570 (6th Cir. 2008) ................................ 33

*Durham v. Martin*, 388 F. Supp. 3d 919 (M.D. Tenn. 2019) .......... 37

*Exec. Ambulatory Surgical Ctr., LLC v. Allstate Fire & Cas. Ins. Co.*,
2022 U.S. Dist. LEXIS 224415 (E.D. Mich. Dec. 13, 2022) ......... 30

*Fleischhauer v. Feltner*, 3 F.3d 148 (6th Cir. 1993) .................... 10, 37

*Good News Club v. Milford Cent. Sch.,* 533 U.S. 98 (2001) ............ 32

*Hazelwood Sch. Dist. v Kuhlmeier*, 484 U.S. 260 (1988) ........... 14, 23

*K.A. v. Pocono Mt. School District,* 710 F.3d 99 (3d Cir. 2013) ...... 34

*Mahanoy Area School District v. B.L.,* 594 U.S. 180 (2021) ..... 18, 35

*Moore v. Ohio River*, 960 F.2d 149 (Table), 1992 WL 78104 (6th Cir.
1992)) ..................................................................................... 30

*Mullenix v. Luna,* 136 S. Ct. 305 (2015) ............................................. 35

*N.J. v. Sonnabend,* 37 F.4th 412 (7th Cir. 2022) .................. 19, 20, 21

*Newsom v. Albemarle Cty. Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003)passim

*Pearson v. Callahan,* 555 U.S. 223 (2009) ......................................... 35

*S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006).......... 30

*Schoenecker v. Koopman,* 349 F. Supp. 3d 745 (E.D. Wis. 2018)25, 26, 28

*Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 508 (1969)

.................................................................................... passim

*Violette v. P.A. Days, Inc.* 427 F.3d 1015 (6th Cir. 2005) .......... 10, 37

*Walker-Serrano v. Leonard,* 325 F.3d 412 (3d Cir. 2003)............... 33

*Walz ex rel. Walz v. Egg Harbor Tp. Bd. of Educ.,* 342 F.3d 271 (3d Cir.

2003) ......................................................................... 33

## Statutes

28 U.S.C. § 1331.................................................................... viii

28 U.S.C. § 1343.................................................................... viii

42 U.S.C. § 1983.................................................................... viii

MICH. COMP. L. § 2.22. ..................................................... 19, 30

## Other Authorities

1 Plutarch's Morals 418 (W.W. Goodwin ed., Little, Brown, and Co.

1878) ........................................................................... 4

## Rules

Fed.R.Civ.Proc. 25 ................................................................ 5

Fed.R.Civ.Proc. 6(a)......................................................... passim

## Constitutional Provisions

First Amendment.............................................................. passim

## Statement on Oral Argument

Appellant C.S. requests oral argument. This case involves an important First Amendment question, on which oral argument may be helpful to the Court.

## Statement on Jurisdiction

### 1.    *District Court Jurisdiction*

The District Court had federal question jurisdiction of this case under 28 U.S.C. § 1331 and 1343, as the Plaintiff sought redress for civil rights violations under 42 U.S.C. § 1983.

### 2. *Appellate Jurisdiction*

On March 30, 2024, the District Court issued an Order granting Defendants-Appellees' (collectively, "School Officials") motion for summary judgment and denying Plaintiff's ("C.S.") motion for summary judgment. Memorandum Opinion and Order, RE 25, Page ID # 596-630. The Clerk of the District Court entered a final judgment the same day. Judgment, RE 26, Page ID # 631. Appellant filed her notice of appeal on April 23, 2024. Notice, RE 27, Page ID # 632-633. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## <u>Statement of the Issues</u>

1.      Did the District Court reversibly err in ruling that the First Amendment does not protect a public-school student's wearing of clothing that depicts firearms in a non-violent, non-threatening manner, based on School Officials' attenuated fears of possible disruption?

2.      Did the District Court reversibly err in granting the School Officials qualified immunity from an award of damages?

3.      Did the District Court reversibly err in disregarding this Circuit's longstanding interpretation of FRCP 6(a) and denying C.S.'s motion to strike the School Officials' summary judgment motion filed after the motion deadline?

## **Statement of the Case**

### **I.     Factual Background**

This case should be a straightforward application of this Circuit's and the Supreme Court's precedent establishing that public-school students do not check their First Amendment protected right to speech at the schoolhouse door. C.S. is a student at Robert Kerr Elementary School ("Kerr Elementary"), a public school operated by the Durand Area Schools in Durand, Michigan. Complaint, RE 1, Page ID # 2. C.S. was in the 3rd grade during the 2021-2022 school year, and appears in this case through her next friend, her father, Adam Stroub. *Id.*; *also* Stroub Deposition, RE 15-2, Page ID ## 140-142.

February 17, 2022, was "Hat Day" at Kerr Elementary, during which the school encouraged students to wear hats. *Id.,* Leffel Deposition p. 7, RE 15-2, Page ID # 188. C.S. wore a baseball hat that was black and featured a white star, a white image of an AR-style rifle, and the words "come and take it" ("the Hat"). Leffel Deposition p. 14, RE 15-2, Page ID # 195; Photo, RE 15-2, Page ID # 217.



C.S.'s mother testified that C.S. specifically chose to wear the Hat, which she had previously given to her father, from among a pile of hats at home. Linfield Deposition, p. 8, RE 17-6, Page ID # 385.

The words "come and take it," especially when used with an image of a star and some kind of weapon, are a common slogan to show support for the right to keep and bear arms. Stroub Deposition, pp. 27-29, RE 15-2, Page ID # 163-165; Complaint, p. 4, RE 1, Page ID # 4. The words "come and take it," together with a star and cannon, make up the

"Gonzalez flag," a symbol of resistance to Mexico's invasion of the colony of Gonzalez, Texas during the Texas Revolution. Stroub Deposition, pp. 30-31, RE 15-2, Page ID # 166-167; Complaint, p. 4, RE 1, Page ID # 4.



*See also The Story Behind Texas' World-Famous 'Come and Take It' Flag*, Hous. Chron., Aug. 12, 2021, https://www.chron.com/news/houston-texas/texas/article/Texas-revolution-Come-and-Take-It-flag-Gonzales-13275757.php (last viewed September 8, 2024).

The phrase "come and take it" is an English translation of the Ancient Greek "μολὼν λαβέ," dating to 480 B.C. when the Ancient Spartans responded to the Persian King Xerxes I's command that the Spartans hand over their arms in advance of the Battle of Thermopylae. 1 Plutarch's Morals 418 (W.W. Goodwin ed., Little, Brown, and Co. 1878). Complaint p. 4, RE 1, Page ID # 4. Its roots run deep in American

history—in addition to the Gonzalez flag, the phrase was uttered by American Col. John McIntosh in November 1778 in response to a British demand to surrender Ft. Morris, Georgia; the British declined to "come and take it." Complaint, p. 4, RE 1, Page ID # 4; https:/gastateparks.org/FortMorris (last viewed September 13, 2024).

Defendant-Appellee Michael Papanek is the "On Track Coach" at Kerr Elementary, whose duties include administering discipline in the school to "try to help students stay on track with their behavior." Papanek Deposition, pp. 5-6, RE 15-2, Page ID # 250-251. Papanek saw C.S. at school on February 17, 2022, and noticed the Hat. Papanek Deposition, p. 7, RE 15-2, Page ID # 252. He believed the Hat may have been in violation of school policy, so he went to the office of Defendant-Appellee Amy Leffel ("Leffel"), Kerr Elementary's then-principal, to tell her about the Hat and seek her advice. *Id.*, pp. 7-8, RE 15-2, Page ID # 252-253.[1]

Defendant-Appellee Craig McCrumb, superintendent of Durand

---

[1] Leffel has been replaced as Kerr Elementary's Principal by Tanya Klont. Klont Deposition, p. 4, RE 15-2, Page ID # 271. Klont has been substituted in automatically in her official capacity, Fed.R.Civ.Proc. 25(d), while Leffel remains as a Defendant in her individual capacity.

Area Schools, was in Leffel's office when Papanek arrived, and McCrumb was present for the conversation between them. McCrumb Deposition, p. 5, RE 15-2, Page ID # 124; Leffel Deposition, p. 27, RE 17-4, Page ID # 345; Papanek Deposition, p. 7, RE 17-11, Page ID # 430. Leffel and Papanek determined that Papanek should call C.S.'s parents and ask for a substitute hat. Leffel Deposition, p. 12, RE 17-4, Page ID # 341. Papanek called C.S.'s home and ultimately spoke with Stroub. Papanek Deposition, pp. 11-12, RE 17-11, Page ID # 431. Papanek asked Stroub to provide an alternative hat for C.S., but Stroub declined to do so. *Id.*

Papanek and Leffel both claim to have told C.S. to remove the Hat and put it in her locker, but there is no dispute that one of them did. Leffel Deposition, p. 12, RE 17-4, Page ID # 341; Papanek Deposition, p. 13, RE 17-11, Page ID # 431.

The Kerr Elementary school dress code states in pertinent part: "Anything printed on clothing must not be offensive in any way. The building principal/staff has the right to decide what is offensive, but some examples are: words/slogans that advertise illegal substances, words/slogans that are racially or religiously offensive, violence themes,

vulgar or sexual innuendo, etc." Student Handbook, p. 14, RE 17-5, Page ID # 364. As Principal, Leffel had discretion to interpret and enforce the dress code. Leffel Deposition, p. 19, RE 15-2, Page ID # 200. Leffel testified that she determined that the Hat was not "appropriate." *Id.*

In an email exchange with Stroub, on which McCrumb was copied, Leffel stated, "Weapons of any kind are not appropriate for students to wear in a school setting." 2/17/22 email, RE 15-2, Page ID # 216; Leffel Deposition, p. 14, RE 15-2, Page ID # 195. Leffel has made clear she did not suspect C.S. of having an ***actual*** weapon. Leffel Deposition, p. 15, RE 15-2, Page ID # 196.

C.S. enjoys shooting rifles with her father. C.S. Declaration, p. 2. RE 20-1, Page ID # 504; Stroub Deposition, pp. 24-25, RE 17-3, Page ID # 327; Photos, RE 20-2, Page ID ## 546, 548-549.



In September 2020, more than a year before Hat Day, C.S. attended a Second Amendment rally in Lansing with her parents. Stroub Deposition, p. 24, RE 17-3, Page ID # 327; Photos, RE 20-2, Page ID ## 547, 550-556. At the rally, she appeared in several news photos carrying a Gadsden flag ("Don't Tread on Me") and with a toy rifle slung across her shoulder. Photos, RE 20-2, Page ID ## 550-556.



## II.    Procedural Background

On May 9, 2022, C.S. filed the underlying lawsuit against Defendants-Appellees seeking declaratory and injunctive relief. C.S. timely moved for summary judgment. Amended Case Management Order, p. 2, RE 14, Page ID # 68; MSJ, RE 15, Page ID ## 72-74; Brief, RE 15-1, Page ID ## 75-101; Fact Appendix, RE 15-2, Page ID ## 102-

277. The School Officials responded, Response, RE 19, Page ID ## 450-476, and C.S. filed a reply. Reply, RE 21, Page ID ## 572-581.

The School Officials, however, failed to timely seek summary judgment, filing a belated motion two days after the motion deadline. School Officials' MSJ w/ attachments, RE 17 through RE 17-12, Page ID ## 279-436; C.S.'s MSJ Response w/ attachments, RE 20 through 20-2, Page ID ## 477-571; School Officials' Reply, RE 22, Page ID ## 582-593.

In their untimely motion, the School Officials cited C.S.'s deposition testimony about why she chose the Hat to wear to school on Hat Day:

> Q: Why did you pick that hat?
> A: Because it made me feel safe.
> Q: Okay. Is that because it's your dad's hat?
> A: Yeah; yes.
> Q: You love your dad; right?
> A: Yes.
> Q: You want to be cool like your dad; right?
> A: Yes.

C.S. Deposition, p 7, RE 15-2, Page ID # 111. The School Officials' motion depicted that as the *sole* reason C.S. wore the Hat, despite their failure at deposition to ask her if that was the only reason, or to inquire

whether there were any others. Motion, p. 6, RE 17, Page ID # 297.[2] In response, C.S. testified via declaration that she chose the Hat to wear "because it is my father's and makes me feel safe *and because it shows my support for the right of people to have guns.*" C.S. Declaration, RE 20-1, Page ID # 504 (emphasis added).

C.S. moved to strike the School Officials' untimely summary-judgment motion, citing this Court's longstanding rule that FRCP 6(a) does not apply to extend a date-certain filing deadline even when it falls on a weekend or holiday. Motion, RE 18, Page ID ## 437-439; Brief, RE 18-1, Page ID ## 440-449, citing *Violette v. P.A. Days, Inc.* 427 F.3d 1015, 1017-19 (6th Cir. 2005), and *Fleischhauer v. Feltner*, 3 F.3d 148 (6th Cir. 1993). Without awaiting a response from the School Officials, the district court denied C.S.'s motion in a text-only order that mentioned neither *Violette* nor *Fleischhauer*. 4/28/23 Text-Only Order (No RE or Page ID # available) ("Defendants are cautioned to ensure their compliance with future deadlines set by the Court. Signed by District Judge Terrence G. Berg.").

---

[2] The School Officials also failed to ask C.S. about the meaning of the message on the Hat (i.e., they only asked her why she picked the Hat to wear that day, but not about the Hat itself).

The District Court heard oral argument on the cross-motions for summary judgment on January 23, 2024. Notice, RE 24, Page ID # 595; Transcript, RE 29, Page ID ## 635-679. On March 30, 2024 the court issued its Memorandum Opinion and Order, granting the School Officials' motion and finding them entitled to summary judgment and qualified immunity, and denying C.S.'s motion for summary judgment. Memorandum Opinion, RE 25, Page ID ## 596-630.

The District Court credited Leffel with determining that the Hat was forbidden at school for three separate reasons:

First, the District Court cited Leffel's deposition testimony in finding the Hat violated the dress code's prohibition on "violence themes" because it depicted a weapon:

> Well, it has a weapon on it, and the phrase, "Come and take it." I took that as threatening. The phrase itself seems like it's trying to incite someone to come and have an altercation to take the weapon. . . [W]e're in an elementary school setting and it is a gun-free zone. And I didn't feel that any type of weapons are appropriate in the school setting or anything that suggests violence. Guns often suggest violence.

Memorandum Opinion, at 5, RE 25, Page ID # 600 (quoting Leffel Deposition, RE 15-2, Page ID ## 196-197). The District Court also cited

Leffel's testimony that she applies the discretion the Handbook affords her in banning "vulgar wording, inappropriate pictures, logos not appropriate for school." *Id*. (citing Leffel Deposition, RE 15-2, Page ID # 189). She generally applied it to ban "anything that incites—has violent themes or can incite violence of disrupt the educational setting." *Id*. (quoting Leffel Deposition, RE 15-2, Page ID # 197). As the District Court noted, according to Leffel "there is no . . . pictures of weapons that would be appropriate in the school setting at any time." *Id*. (citing Leffel Deposition, RE 15-2, Page ID # 203).

Second, the District Court pointed to Leffel's concern that the Hat's "come and take it" message would be interpreted literally by "impetuous" grade-schoolers who would try to do just that, which "could incite an altercation." Memorandum Opinion, p. 6, RE 25, Page ID # 601 (quoting Leffel Deposition, RE 15-2, Page ID ## 206, 203).

Finally, the District Court credited Leffel's concerns that the firearm depiction could "disrupt the educational environment, claiming some Kerr Elementary students had moved from Oxford, Mich. and were receiving counseling and social work support to deal with the trauma" from the shootings at that town's high school. Memorandum

Opinion, p. 6, RE 25, Page ID # 601, quoting Leffel Deposition, RE 15-2, Page ID # 205 and 207. Notably, that Leffel testimony the Opinion presents as a block quote is actually two separate passages separated by two full transcript pages, with significant material intervening in the gap denoted by ellipses, including Leffel's expressed concern about "impetuous" students viewing "come and take it" as a dare. *Id.*

The District Court also cited testimony from Klont, Leffel's successor as principal, that the Hat was "objectionable because it has a gun. And we are trying to teach kids how to be peaceful." Memorandum Opinion, p. 10, RE 25, Page ID # 605. Klont also thought it would "make students uncomfortable" given their anxiety over the Oxford shooting, and echoed Leffel's concern that students could interpret the message as "come and take this hat." Memorandum Opinion, pp. 10-11, RE 25, Page ID ## 605-606, quoting Klont Deposition, RE 15-2, Page ID ## 175, 274-275.

After surveying the caselaw, and assuming (despite what it called "the poorly-developed state of the record") that C.S. intended to wear the Hat to convey her opinion about the Second Amendment, the District Court nonetheless concluded "C.S. has failed to raise a genuine

issue of material fact that a jury would need to decide." Memorandum Opinion, pp. 12-28, RE 25, Page ID ## 607-623. The District Court rejected the School Officials' argument that *Hazelwood Sch. Dist. v Kuhlmeier*, 484 U.S. 260 (1988), applied, and instead found the case governed by *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 508 (1969). Yet the District Court cited *Hazelwood*'s allowance for school officials to take into account legitimate pedagogical goals and students' "level of maturity." Memorandum Opinion, pp. 28-30, RE 25, Page ID ## 623-625. The District Court reasoned that the School Officials could validly "prohibit clothing featuring 'violence themes,' interpreted as depictions of any sort of weapons, because they teach elementary school students, and they believed such depictions could work disruptions in the school environment." *Id*, p. 30, RE 25, Page ID # 625.

   As the District Court further reasoned,

> Facially, this dress code regulation is viewpoint-neutral and does not target slogans, sympols, or language intending to convey support for the Second Amendment; as Rober Kerr officials have interpreted it, the regulation simply bans all depictions of weapons and violent themes.

*Id*. The District Court also said there was no record evidence that the school applied the regulation selectively, rejecting C.S.'s argument that

the dress code would also ban clothing with Michigan's seal (bearing an armed man) or hunting t-shirts, since there was no evidence the school previously allowed clothing with such imagery. Memorandum Opinion, pp. 30-31, RE 25, Page ID # 625-626. It also credited the School Officials' speculation, "informed by many years of experience with elementary school students," that the "come and take it" message posed "a not-insignificant risk of classroom disruption" and "inciting fights." *Id*, Page ID # 626. The District Court cited student concerns over the Oxford shooting, and excused the School Officials' failure to provide evidence of a reasonable forecast of susbtantial disruption by saying C.S. had presented no evidence sufficient to create a factual dispute over the reasonableness of their predictions. Memorandum Opinion, RE 25, Page ID ## 627-628.

Finally, the District Court found the School Officials entitled to qualified immunity from money damages "because elementary school students have no clearly established right to wear clothing depicting weapons." *Id*, p. 34, Page ID # 629.

This appeal timely followed.

## Summary of the Argument

Under *Tinker,* C.S.'s right to wear the "Come and Take It" Hat is protected under the First Amendment. The First Amendment protects elementary school students (not just junior-high or high-school students) and there was not enough evidence of substantial disruption to allow the school to suppress C.S.'s speech. Moreover, the District Court applied the test for school-sponsored speech even though the School Officials failed to show the speech was school-sponsored.

The District Court therefore erred in granting the School Officials' motion for summary judgment. Since *Tinker* has been clearly established law for more than a half-century, the court also reversibly erred in finding the School Officials entitled to qualified immunity.

Procedurally, the District Court reversibly erred in disregarding this Court's clear instructions on how FRCP 6(a) is to be applied in cases of a date-certain deadline, and in allowing the School Officials to file their untimely motion.

## Argument

### I.    C.S.'s First-Amendment Protected Rights Were Violated.

### A.    The First Amendment Protects Student Speech, Including Speech that Depicts Weapons.

*Tinker* makes clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. To justify censoring speech, school officials "must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Instead, the Supreme Court ruled, as relevant here, student speech is unprotected by the First Amendment only where it has the potential to cause substantial disruption. 393 U.S. at 509. To be sure, there are

> [t]hree specific categories of student speech that schools may regulate in certain circumstances: (1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper.

*Mahanoy Area School District v. B.L.,* 594 U.S. 180, 187–88 (2021). But where—as here—none of these exceptions apply, *Tinker* provides the legal rule.

And there is no exception from the First Amendment for speech that depicts weapons, as federal courts have recognized. For instance, *Newsom v. Albemarle Cty. Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003), upheld a middle-school student's right to wear a T-shirt to school depicting the letters "NRA" and people pointing rifles. The student was told he could not wear the shirt to school because "guns and schools don't mix," but the court disagreed: "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Id.* at 252. *Newsom* also correctly points out that nonviolent and nonthreatening images or messages related to weapons would fall squarely under *Tinker's* disruption standard. *Id.*

> In considering the case, the *Newsom* Court noted
>
> there simply is no evidence in the record . . . demonstrating that clothing worn by students at [the school] containing messages related to weapons, nonviolent, nonthreatening, or otherwise, ever substantially disrupted school operations or interfered with the rights of others. Indeed, there is no evidence that Newsom's t-shirt, let alone any other article of clothing worn by a student that contained a message relating

> to weapons, ever caused a commotion or was going to cause one at [the school]. This lack of evidence strongly suggests that the ban on messages related to weapons was not necessary to maintain order and discipline at [the school].

*Newsom*, 354 F.3d at 252. The *Newsom* Court also noted that the dress code at issue there would prohibit the State Seal of the Commonwealth of Virginia, because it depicts a woman holding a spear. *Id.* at 260. In the present case, the school dress code, as interpreted by the School Officials, would similarly prohibit displaying the Seal of the State of Michigan, which depicts a man holding a long gun. Great Seal Image, RE 15-1, Page ID # 98; *see also* MICH. COMP. L. § 2.22.

Likewise, *N.J. v. Sonnabend,* 37 F.4th 412 (7th Cir. 2022), held that *Tinker* applied when a high-school student wore a T-shirt to school that depicted a handgun and school officials told the student he could not wear the shirt: "*Tinker* provides the legal standard: restrictions on student speech are constitutionally permissible if school officials reasonably forecast that the speech would materially and substantially disrupt the work and discipline of the school or invade the rights of others." *N.J.*, 37 F.4th at 416. As in this case, in *N.J.* the principal said clothing depicting firearms was "inappropriate." *Id.* at 421. But the

Seventh Circuit concluded that "[a]n undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 423 (citing *Tinker*, 393 U.S. at 508). The Court remanded the case to the district court for application of *Tinker*, emphasizing that, "school officials must present facts that might reasonably have led school authorities to forecast *substantial disruption of* or *material interference with* school activities or the invasion of the rights of others." *Newsom*, 37 F.4th at 426 (cleaned up, emphasis added) (citing *Tinker*, 393 U.S. at 514, and *Nuxoll*, 523 F.3d at 673). "[M]ere speculation won't do." *Id.* (citation omitted). "It's an objective inquiry, and *Tinker* places the burden of justifying student-speech restrictions squarely on school officials." *Id.* (citing *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (collecting cases)).

The same application of *Tinker* as courts employed in *Newsom* and *N.J.* requires reversal here. The Hat in this case is like the antiwar armbands held to be constitutionally protected in *Tinker* and the weapons-depicting T-shirts in *Newsom* and *N.J.* The Hat is thus protected speech unless and until the School Officials present facts that might reasonably have led them to forecast substantial disruption of or

material interference with school authorities or the invasion of the rights of others—which they cannot do here.

It is not enough for Defendants to have a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint, or an undifferentiated fear or apprehension of disturbance. School Officials' professed concerns over possible disruption and "scuffling" was mere speculation over a possibility, and not "facts that might reasonably have led school authorities to forecast *substantial disruption of* or *material interference with* school activities or the invasion of the rights of others." *N.J.*, 37 F.4th at 426 (emphasis added).

Indeed, the School Officials failed to present any such facts. The extent of the disruption Leffel forecast was minimal:

> Q: Did you think that the image of a rifle on the hat would cause any kind of disruption in the school?
> A: I felt it could, yes.
> Q: And what kind of disruption did you think it would cause?
> A: Fear.
> Q: Fear among?
> A: Students.
> . . .
> Q: Any other kind of disruption you thought might occur other than fear among students?

A: I felt staff would be very uncomfortable with it as well.

Q: And how did you think that discomfort would manifest itself?

A: Well, they would communicate to me that that was—if it wasn't addressed, I know staff would have reached out to notify me that we had a student wearing that and it did not fall within our dress code policy.

. . .

Q: [I]s there any other way that you thought that allowing C.S. to wear the hat would cause a disruption?

A: Other than inciting fear?

Q: Yes.

A: I can't speak for what might have happened.

Q: The phrase "Come and take it," did you think that that might cause a disruption?

A: Possibly.

Q: And what kind of disruption did you think it might cause?

A: Again, I would only theorizing [sic] about what could have happened. But we have young—young kids who can be very impetuous and could perceive that as a dare to try and take the hat off her.

*Id.,* pp. 2325, Page ID # 204-206.

What Leffel described, of course, is merely a generalized desire to avoid unpleasantness and an undifferentiated fear—exactly what *Tinker* instructs is ***not*** a valid basis for censoring speech. She admitted that she was only speculating on what might have happened. She had no actual facts to support a reasonable forecast; she only guessed.

22

**B.      The District Court Applied Rules for School-Sponsored Speech Despite Finding that School Officials Failed to Demonstrate the Hat was School-Sponsored.**

The District Court ruled that the School Officials had a "legitimate pedagogical objective of preventing school and classroom disturbances before they occurred." Memorandum Opinion, p. 33, R. 25, Page ID # 628. But the phrase "legitimate pedagogical concerns" is straight from *Hazelwood*, and states the rule for cases involving *school-sponsored* speech. 484 U.S. at 273 ("[W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."). Here, however, the District Court expressly rejected School Officials' attempt to frame the Hat as school-sponsored speech because it was worn in the context of "Wear a Hat Day" during the "Kindness Challenge." As it stated:

> [T]he Court does not necessarily agree with school officials that the act of wearing a hat with a certain message during "Hat Day" should be considered school sponsored speech, such that school administrators had heightened control over its contents. The wearing of particular hats on "Hat Day" does not appear to entail the kind of expression that a reasonable observer would be likely to view as carrying "the imprimatur of the school," like the newspapers at issue in *Hazelwood*. This

23

is so despite Defendants' observations at the hearing that—
since the school generally prohibited hats—a passerby might
be surprised to see a student leaving school wearing a hat.
The Court therefore concludes that the standard set out in
*Tinker* must govern.

Memorandum Opinion, pp. 28-29, RE 25, Page ID ## 623-624].

The District Court correctly declined to find the Hat school-
sponsored activity. As the Fourth Circuit explained in *Newsom*,

> Clothing worn by Newsom and perhaps by other students
> that contain messages related to weapons are not school-
> sponsored, nor does [the school] supply any of the resources
> involved in the clothing worn by students. More importantly,
> no reasonable observer could conclude that [the school]
> somehow endorsed the t-shirt worn by Newsom, or any other
> student's clothing that contained a message related to
> weapons."

354 F.3d at 257.

But the District Court's analysis went awry in declining to apply
the test for a student's own speech, which requires the School Officials to
produce "facts that might reasonably have led school authorities to
forecast *substantial disruption of* or *material interference with* school
activities or the invasion of the rights of others," and not simply of a mere
"concern." *Newsom*, 37 F.4th at 426 (cleaned up, emphasis added) (citing
*Tinker*, 393 U.S. at 514 and *Nuxoll*, 523 F.3d at 673). Just as in *Newsom*,
"there was no evidence presented . . . demonstrating that clothing worn

by students at [the school] containing messages related to weapons, nonviolent, nonthreatening, or otherwise, ever substantially disrupted school operations or interfered with the rights of others," 354 F.3d at 259, or any evidence demonstrating that there was a reasonable likelihood of such disruption in the future.

Leffel testified that some Robert Kerr students had previously been in the Oxford school district, which had experienced a school shooting. Leffel Deposition, p 24, RE 15-2, Page ID # 205. She had conversations with those students' parents, and some students were receiving counseling and social work support. *Id.* That is, some students had concerns about the shooting ***at Oxford***, and for that reason Leffel "didn't feel [the Hat] was appropriate." *Id.*

But that is the very argument that was rejected by *Schoenecker v. Koopman,* 349 F. Supp. 3d 745 (E.D. Wis. 2018). In *Schoenecker,* a student was disciplined for wearing T-shirts to school that depicted various firearms and other weapons. *Id.* at 747. The shirts made some teachers "uncomfortable and concerned about school safety, especially because the [student] wore the shirts shortly after the shooting at Marjory Stoneman Douglas High School in Parkland, Florida." 349 F.

Supp. 3d at 752-53. Enjoining school officials, the *Schoenecker* Court drew a distinction between concerns students felt over a school shooting elsewhere and the lack of any threat or threatening feelings caused them by the actual clothing worn by their classmate:

> As far as the record reveals, no students felt threatened by the plaintiff's shirts. Yes, some students were concerned about school shootings in general, but no evidence suggests that the plaintiff's shirts contributed to any student's anxiety. ***The evidence is that the actual school shooting in Parkland, Florida was what prompted the students' concerns***. The defendant tells us that the plaintiff's shirts made some staff members uncomfortable and concerned about school safety, but there is no evidence that any staff member's ability to provide instruction to students was affected. Moreover, the staff members' reaction to the shirts seems unreasonable, as none of the shirts promote gun violence.

349 F. Supp. 3d at 753 (emphasis added).

In the present case, Leffel testified that some students were concerned about an actual school shooting in Oxford—but she acknowledged that no students expressed concern about C.S.'s Hat. R. 17-4, Leffel Depo., p. 23, Page ID # 204. Just as the unreasonable staff members in *Schoenecker*, School Officials here reacted based not on a reasonable fear the Hat would promote violence or disruption, but on their own personal dislike of guns. 2/17/22 Leffel email to Stroub, RE

15-2, Page ID # 216; *also* Leffel Deposition, p. 14, RE 15-2, Page ID # 195 ("Weapons of any kind are not appropriate for students to wear in a school setting."); *accord* Leffel Deposition, RE 15-2, Page ID # 203 ("[T]here is no . . . picture[] of weapons that would be appropriate in the school setting at any time"; Klont Deposition, p. 8, RE 15-2, Page ID # 275 ("I think mainly it would be objectionable because it has a gun. And we are trying to teach kids how to be peaceful.").

Leffel in fact testified that no weapons could ever be depicted on any clothing at any time for any reason:

> Q: And then let me ask you about how the policy would apply generally. I don't want to put words in your mouth. But I understand what you've said is that any clothing depicting a weapon would not be allowed; is that correct?
>
> A: Correct.
>
> Q: So it wouldn't really matter the nature of the weapon or how it was displayed or anything like that?
>
> A: Correct.

*Id.,* p. 27, ll. 2-9, Page ID # 208. Under Leffel's interpretation, therefore, even a hat depicting the Michigan state seal or the Michigan state flag would be banned:[3]

---

[3] https://statesymbolsusa.org/symbol-official-item/michigan/state-seal/seal-michigan (last viewed July 31, 2024).



The image in the center of the seal is a man with his right hand raised up and his left hand holding a long gun. MCL § 2.22 ("[M]an . . . sinister arm with gun stock resting[.]"). Indeed, Leffel's interpretation would ban display of the Michigan state flag anywhere on school property.

But like the T-shirts in *Schoenecker*, the Hat bore an image of a rifle without any depiction or promotion of gun violence. And Leffel

admits she did not suspect C.S. of having an ***actual*** weapon. Leffel

Deposition, p. 15, RE 15-2, Page ID # 196.

### C.  Unrebutted Evidence Established that C.S.'s Purpose in Wearing the Hat Was to Express Her Well-Established Views in Support of Gun Rights and the Second Amendment.

C.S.'s use of the symbol on the Hat she wore to school that day is

nothing more than her showing support for the United States

Constitution and the Second Amendment. And the First Amendment

protects her right to express her support for the Second Amendment.

It is unclear from the Memorandum Opinion, but the District Court

appeared to discount C.S.' Declaration, in which she testified to two

reasons for wearing the hat—"because it is my father's and makes me

feel safe and because it shows my support for the right of people to have

guns." Declaration, RE 20-1, Page ID ## 503-504. As noted above, C.S.

submitted that with her Response to the School Officials' summary-

judgment motion, since the School Officials' motion portrayed her

deposition answer (referring only to her father) as exhaustive.

Citing an unpublished 1992 decision, the District Court implied,

without explicitly holding, that C.S.'s declaration conflicted with her

deposition and would be disregarded. Memorandum Opinion, pp. 23-24, RE 25, Page ID ## 618-619 (citing *Moore v. Ohio River*, 960 F.2d 149 (Table), 1992 WL 78104, at *3 (6th Cir. 1992)). As C.S. argued below, however, her Declaration should be fully considered because it in no way contradicted her deposition testimony, but rather filled in gaps in the School Officials' questioning of her. RE 20 Response, p. 20 & fn. 3, Page ID # 497, citing *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (post-deposition affidavit that does not "directly contradict" deposition testimony must be considered unless court determines it constitutes an attempt to create a sham fact issue), and *Exec. Ambulatory Surgical Ctr., LLC v. Allstate Fire & Cas. Ins. Co.*, 2022 U.S. Dist. LEXIS 224415, *10-11 (E.D. Mich. Dec. 13, 2022) (court considered portion of Plaintiff's affidavit discussing the use of CPT codes "because it fills a gap in his deposition testimony, responds to an argument raised in Allstate's Motion, and does not contradict prior testimony").

As noted above, after School Officials at her deposition asked C.S. why she chose the Hat and elicited the answer "because it made me feel safe," their sole follow-up question was a leading one as to *why* it made

her feel safe. C.S. Deposition, p. 7, RE 15-2, Page ID # 111 ("Q. Okay. Is that because it's your dad's hat? A. Yes. Q. You want to be cool like your dad; right? A. Yes."). Counsel never asked C.S. if that was the only reason she chose the Hat, if there was any other reason, if she was trying to send a message in wearing it, or if she had anything else to say on that topic. *Id.* C.S.'s declaration answered those unasked questions by saying that Hat "shows my support for the right of people to have guns." Declaration, p. 2, RE 20-1, Page ID # 504. There is no conflict between the deposition and the declaration; rather, the latter filled in a factual gap created in the former by School Officials' less-than-thorough inquiry.

In reviewing a grant of summary judgment to McCrumb, this Court must construe all facts in the light most favorable to C.S. Though its discussion is somewhat unclear, the District Court does not appear to have credited C.S. with wearing the Hat for the deliberate purpose of "showing [her] support for the right of people to have guns." Construing the facts in a light most favorable to her, as the court is obligated to do in resolving the School Officials' summary-judgment motion, C.S. was clearly entitled to First Amendment protection for wearing a message

31

intended to support the Second Amendment. The District Court reversibly erred in granting summary judgment.

**D.    The District Court Erroneously Watered Down C.S.'s First Amendment Protections on the Grounds That She Is an Elementary-School Student.**

The District Court also suggested that elementary-school students such as C.S. may not have full First Amendment-protected rights. Memorandum Opinion, p. 33, RE 25, Page ID # 628 ("But this case concerns students who are far younger: Robert Kerr Elementary is a school for students in the second to fifth grades. These students are less mature and capable of reining in emotional outbursts than junior high or high schoolers."). But the Supreme Court recognized in *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98 (2001), that speech by and to "elementary school children" is protected by the Free Speech Clause, *id.* at 112, notwithstanding concerns that elementary school students are too immature to appreciate the difference between private speech and school-sponsored speech, *id.* at 112-13. Likewise, *Morgan v. Swanson,* 610 F.3d 877, 885, (5th Cir. 2020) (en banc), made clear that the student-speech rights announced in *Tinker* inhere in the elementary school context.

To be sure, the age of a student may be relevant in some situations to a First Amendment analysis. *See Curry v. Hensiner,* 513 F.3d 570, 578 (6th Cir. 2008) ("In an elementary school setting, the appropriateness of student expression depends on several factors, including the type of speech, the age of the locutor and audience, the school's control over the activity in which the expression occurs, and whether the school solicits individual views from students during the activity.") (quoting *Walz ex rel. Walz v. Egg Harbor Tp. Bd. of Educ.,* 342 F.3d 271, 278 (3d Cir. 2003)). Thus, for instance, "[h]uman sexuality provides the most obvious example of age-sensitive matter," *Walker-Serrano v. Leonard,* 325 F.3d 412, 417 (3d Cir. 2003), though other topics may qualify as well. But *Walker-Serrano* made clear that, "That age is a crucial factor in this calculus does not necessary mean that third graders do not have First Amendment rights under *Tinker.*" *Id.* The test for elementary-school students, as for older students, remains the *Tinker* substantial disruption test:

> *Tinker* permits school regulation of student speech whenever the school can show that the speech would be disruptive, or would interfere with the rights of other students. In essence, *Tinker* requires that schools have a legitimate educational or disciplinary justification for regulating student expression. That elementary schools require a greater degree

of control, or a different kind of control, over students might be accommodated within the *Tinker* analysis.

*Id.*

Indeed, the Third Circuit later made clear that "*Walker-Serrano* did not hold that *Tinker* analysis has no place in the elementary school setting." *K.A. v. Pocono Mt. School District,* 710 F.3d 99 (3d Cir. 2013). "We agree with [the Fifth Circuit in *Morgan*] and hold that the *Tinker* analysis has sufficient flexibility to accommodate the educational, developmental, and disciplinary interests at play in the elementary school environment." *Id.* at 111.

There is no authority for the proposition that advocating for the constitutionally protected right to keep and bear arms is a topic that should be out of reach of elementary-school students, or that it is somehow inherently disruptive for such students. There is no reason not to apply the *Tinker* standard to the facts of the present case.

## II.    The District Court Erred in Granting Qualified Immunity

In the final paragraph of the body of the District Court's opinion, the District Court granted the School Officials qualified immunity. R. 25, p. 34, Page ID # 629. In a single sentence, the District Court said, "[Qualified immunity] would protect [McCrumb] from any monetary

damages sought because elementary school students have no clearly established right to wear clothing depicting weapons." *Id.*

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutionally protected rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). A court considering qualified immunity considers (1) whether the facts the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right is clearly established at the time of defendant's alleged misconduct. *Id.* at 232. To defeat qualified immunity, a plaintiff must show that the right violated is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015). It is not necessary that a case be directly on point, but existing precedent must have placed the constitutional question beyond debate. *Id.*

In this case, *Tinker*, as reaffirmed by *B.L.*, clearly establishes that school student clothing expressing speech is protected absent a reasonable forecast of a substantial disruption. As shown above, the *Tinker* standard applies in the elementary school setting. The message

35

on C.S.'s Hat is pure speech. It is therefore protected unless there is a reasonable forecast of a substantial disruption; and Leffel's deposition made clear that she was not making a reasonable forecast of actual disruption. Page ID # 207.

In addition, *Newsom* is on point, holding that the First Amendment protects students who wear clothing that depicts weapons in a non-violent, non-threating manner. 354 F.3d at 259.

Leffel was thus on notice that C.S.'s wearing of the hat was protected speech and that she violated C.S.'s clearly established constitutionally protected rights. She is not entitled to qualified immunity.

## III.   The District Court Disregarded this Court's Clear Interpretation of FRCP 6(a) in Entertaining the School Officials' Untimely Summary-Judgment Motion.

As noted above, the parties stipulated to an extension of the District Court's scheduling order, and the court entered the extension. Amended Case Management Order, RE 14, Page ID # 67. The new cutoff it set for dispositive motions was April 22, 2023, a Saturday. Amended Case Management Order, p. 2, RE 14, Page ID # 68. When the District Officials filed their motion two days late, on Monday, April 24, C.S. moved to

strike, citing this Court's longstanding interpretation of FRCP 6(a) as not applying to extend a date-certain filing deadline, even when it falls on a weekend or holiday. Motion, RE 18, Page ID ## 437-439; Brief, RE 18-1, Page ID ## 440-449, citing *Violette v. P.A. Days, Inc.* 427 F.3d 1015, 1017-19 (6th Cir. 2005), and *Fleischhauer v. Feltner*, 3 F.3d 148 (6th Cir. 1993). But the District Court denied her motion with no reference to that authority and without even discussion, except for the admonition that "Defendants are cautioned to ensure their compliance with future deadlines set by the Court." 4/28/23 Text-Only Order (No RE or Page ID # available).

"A district court is bound to follow the holding of a prior decision of the Court of Appeals for the circuit in which the district court is located until that binding precedent is expressly overruled." *Durham v. Martin*, 388 F. Supp. 3d 919, 934 (M.D. Tenn. 2019) (citation omitted). Under *Violette* and *Fleischhauer*, the School Officials' motion was untimely and the District Court should have rejected it instead of delivering lashes with a wet noodle. Obviously, had the court done so it would not have granted summary judgment—or awarded qualified immunity—to them. Reversal is warranted.

## Conclusion

C.S.'s speech, which expressed her views about constitutionally protected rights, is protected by the First Amendment: Elementary-school students have the right to speak in school unless their speech falls within one of the narrow exceptions to protection (which are not applicable here) or unless their speech can be reasonably forecast to cause substantial disruption. And on this record, no such forecast is possible. Accordingly, Plaintiff-Appellant respectfully requests that this Court reverse the District Court and remand to the District Court with instructions to grant summary judgment in favor of C.S.

Respectfully submitted,

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA 30534
Telephone: (678) 362-7650
jrm@johnmonroelaw.com

/s/ Michael F. Smith
Michael F. Smith (P49472)
The Smith Appellate Law Firm
1717 Pennsylvania Ave. NW, Ste 1025
Washington, DC 20006
(202) 454-2860
smith@smithpllc.com

<u>/s/ Eugene Volokh</u>
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu

ATTORNEYS FOR APPELLANT

## <u>Certificate of Service</u>

I certify that I served a copy of the foregoing Brief of Appellant electronically via this Court's ECF system and via U.S. Mail on September 16, 2024, upon:

Gregory W. Mair
gregmair@owdpc.com

Daniel J. Lobello
dlobello@owdpc.com

O'Neill, Wallace & Doyle, P.C.
300 St. Andrews Road Suite 302
Saginaw, MI  48638

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
Attorneys for Appellant
156 Robert Jones Road
Dawsonville, GA 30534
(678) 362-7650
jrm@johnmonroelaw.com

## Certificate of Compliance

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,206 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Word ver. 2105 in Century Schoolbook 14-point font.

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
Attorneys for Appellant
156 Robert Jones Road
Dawsonville, GA 30534
(678) 362-7650
jrm@johnmonroelaw.com