IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

C.S., by her next friend,
ADAM STROUB,                                    Case No. 24-1364

    Plaintiff-Appellant,                      E.D. Mich. No. 22-cv-10993
                                                Hon. Terrence G. Berg

v.

CRAIG MCCRUMB, *et al*,

    Defendants-Appellants.

_____

## <u>PETITION FOR REHEARING EN BANC</u>

EUGENE VOLOKH
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu

JOHN R. MONROE
JOHN MONROE LAW, P.C.
156 Robert Jones Road
Dawsonville, GA 30534
(678) 362-7650
jrm@johnmonroelaw.com

MICHAEL F. SMITH
THE SMITH APPELLATE LAW FIRM
1717 Pennsylvania Ave. NW, Ste. 1025
Washington, D.C. 20006
(202) 454-2860
smith@smithpllc.com
**Counsel for Plaintiff-Appellant C.S.**

Dated: May 30, 2025

# RULE 26.1 DISCLOSURE OF AFFILIATIONS

Appellants and their attorneys certify that they already filed a disclosure statement in conformity with Rules 28 and 26.1 and they have no amendments to it.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT………………………………..……i

TABLE OF AUTHORITIES………………………………………………………iii

FED. R. APP. P. 40(b)(2) STATEMENT……………………………….......1

STATEMENT OF FACTS NECESSARY TO ARGUMENT………………3

PROCEDURAL HISTORY……………………………………………………………8

SUMMARY OF ARGUMENT………………………………………………………12

ARGUMENT …………………………… …………………………………………13

CONCLUSION………………………………………………………………………21

CERTIFICATE OF SERVICE………………………………………………………23

CERTIFICATE OF COMPLIANCE……………………………………….……24

ADDENDUM……………………..………………………………………………25

Panel Opinion

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barr v. Lafon*, 588 F.3d 544, 561 (6th Cir. 2008)....................................15

*Bible Believers v. Wayne Cty.*, 805 F.3d 228, 234 (6th Cir. 2015) ..........15

*Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966) ............................19

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806

    (1985) ................................................................................................15

*Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 787 (9th Cir. 2022) .17

*Guiles v. Marineau*, 461 F. 3d 320, 324-25 (2d Cir. 2006)......................14

*Hatcher v. Fusco*, 570 Fed. Appx. 874, 877 (11th Cir. 2014). .................17

*L.M. v. Town of Middleborough*, 103 F.4th 854, 875 (1st Cir. 2024) .....19

*Lowery v. Euverard*, 497 F.3d 584, 605 (6th Cir. 2007)..........................14

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187–88 (2021) .............19

*Matal v. Tam*, 582 U.S. 248 (2017) .........................................................15

*N.J. v. Sonnabend*, 37 F.4th 412 (7th Cir. 2022)................................3, 18

*Newsom. v Albermarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2004) ..3, 18

*Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)....16

*Tinker v. Des Moines Independent Comm. Sch. Dist.*, 393 U.S. 503

(1969) ........................................................................ *passim*

*Zamecnik v. Indian Prairie Sch. Dist. #204*, 636 F.3d 874, 877 (7th Cir.

2011) ................................................................................20

**Rules**

Fed. R. App. P. 40(b)(2) ............................................................3

# RULE 40(b)(2) STATEMENT

When her public elementary school scheduled "Wear a Hat Day," C.S., a then-third-grader who enjoys sport shooting and attends Second Amendment rallies with her parents, chose a hat based on the Gonzales flag—the banner with which 19th-century Texans dared Mexican attackers to "come and take" their cannon. C.S. chose the hat, updated with an AR-15, because "it shows my support for the right of people to have guns." Declaration, RE 20-1, Page ID ## 503–04.

Lacking appreciation for their country's history, the First and Second Amendments, and *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), school officials immediately told C.S. to remove the hat. Contrary to later revisionism, they voiced no concern about school shootings or potential trauma to students who had been exposed to such shootings, nor did they articulate facts that reasonably might have forecast substantial disruption, interference with schooling, or impingement of others' rights. Instead, school officials simply voiced their personal opposition to firearms, declaring that pictures of "[w]eapons of any kind are not appropriate for students to wear in a school setting," RE 15-2, Page ID #

216; and speculating that other grade-schoolers might view "come and take it" literally and cause disruption.

After C.S. sued, this case morphed into something completely different. In their summary judgment papers, school officials briefly referred, for the first time, to a shooting that had occurred at a *high school* two counties over, declining to ground the hat-removal order on it but citing it only as "background," since they made no mention of it on Hat Day. In the district court opinion, however, the Oxford shooting featured more prominently as a basis for the school officials' decision and for summary judgment in their favor. And with the panel opinion, the Oxford shooting has moved front and center.

But what the panel opinion paints as a fact-intensive application of *Tinker* is in fact a gutting of that case and a roadmap for future courts to sidestep the First Amendment regarding student speech. School officials' contemporaneously stated reasons for making C.S. remove her hat fall far short of the standards for disciplining attire-based school speech set by *Tinker*. The panel opinion also puts this Court in direct opposition to others that have faithfully applied *Tinker* to message-conveying student attire. *See, e.g.*, *Newsom v. Albermarle*

*Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2004); *N.J. v. Sonnabend*, 37 F.4th 412 (7th Cir. 2022). Because *en banc* review is needed to conform this Court's decision to *Tinker*, to secure uniformity with other Circuits, and to address this exceptionally important First Amendment issue, rehearing *en banc* is warranted under Federal Rule of Appellate Procedure 40(b)(2)(B)–(D).

## STATEMENT OF FACTS

Plaintiff C.S. in 2021-22 was a straight-A third-grader at Robert Kerr Elementary School ("Kerr Elementary"), a public school in Durand, Michigan. Complaint, RE 1, Page ID # 2.

In September 2020, more than a year before the incident at the heart of this action, C.S. attended a Second Amendment rally at the Capitol in Lansing with her parents. She appeared in several news photos carrying a Gadsden flag with a toy rifle slung across her shoulder. RE 20-2, Page ID # 550–56:



During Kerr Elementary's weeklong "Great Kindness Challenge" in February 2022, February 17 was "Hat Day," when the school encouraged students to wear hats of their choice. C.S. wore a black baseball hat featuring a white star, a white image of an AR-style rifle, and the phrase "come and take it." RE 15-2, Page ID # 217:



It is undisputed that "come and take it," when used with an image of a star and weapon, is a common symbol supporting the right to keep and bear arms. Together those items comprise an homage to the "Gonzales flag," a symbol of resistance to Mexico's invasion of the colony of Gonzales, Texas during the Texas Revolution. Complaint, at 4, RE 1, Page ID # 4. Its roots run deep in American history— American Col. John McIntosh in November 1778 also uttered the phrase responding to a British demand to surrender Ft. Morris,

Georgia; the British declined his challenge. *Id.*



On Hat Day, C.S. chose the hat from among several at home. Though Defendants cited their less-than-thorough deposition examination as establishing that C.S. chose the hat solely because it reminded her of her father, both the district court and the panel credited her full testimony that she also wore it as "support for the right of people to have guns." Panel Opinion, at 6 & n.3; *see also* District Court Opinion, at 28 (assuming C.S. intended to wear the hat to convey her opinions about the Second Amendment).

Michael Papanek, the "On Track Coach" at Kerr Elementary whose duties include administering school discipline, noticed C.S. wearing the hat and thought it violated the school dress code. He immediately went to the office of Kerr Principal Amy Leffel, where Durand Area Schools Superintendent Craig McCrumb was visiting.

The school officials agreed to have Papanek call C.S.'s parents and ask for a substitute hat, but C.S.'s father declined. They told C.S. to remove the hat and put it in her locker, which she did.

As Principal, Leffel had discretion to interpret and enforce the school dress code. The morning of Hat Day, Leffel determined that the hat was not "appropriate." In her view, any depiction of any weapon at any time on student clothing would violate Kerr's dress-code policy: "I feel there is no appropriate pictures of weapons that would be appropriate in the school setting at any time." She also viewed its phrase "come and take it" "as inciting an altercation or could incite an altercation." Leffel Deposition, at 19–22, Page ID ## 200–03.

The evening of Hat Day, Leffel emailed C.S.'s father, Adam Stroub, copying Superintendent McCrumb, to reiterate why they made C.S. remove the Hat. The email noted only that "[w]eapons of any kind are not appropriate for students to wear in a school setting." RE 17-12, Page ID # 436. It made no mention of the Oxford shooting or of student concerns relating to it.[1] *Id*.

---

[1] Oxford High School is in Oakland County, 50 miles and two counties from Kerr Elementary in Shiawassee County. FRE 201(b) & (c). Its students are in grades 9-12, while Kerr students are K-5. *Id*. On

# PROCEDURAL HISTORY

C.S. by her father/next friend filed her Complaint under 42
U.S.C. § 1983 on May 9, 2022, against McCrumb, Leffel, and Papanek,
alleging violations of the First Amendment and the Fourteenth
Amendment's due process clause.

At her deposition 10 months post-incident, Leffel repeated her
Hat-Day views that no weapon imagery was ever appropriate in
school, and that she interpreted "come and take it" as something that
"could incite an altercation." Then for the first time, she ascribed to the
Oxford shooting a role in her decision:

> Well, other than the—we have students that attended—
> attended Robert Kerr that had moved from Oxford. And I had
> had several conversations with their parents. And those  were
> receiving counseling and social work support to deal with the
> trauma. And so—and again in this day and age, it's—with all
> the school shootings we have, it's a picture of an automatic
> weapon. I didn't feel it was appropriate.

Leffel Deposition, at 24, RE 15-2, Page ID # 205.

Neither Leffel nor any other school official offered any details

---

November 30, 2021, a deranged 15-year-old student went on a shooting
rampage at Oxford High, killing four students and injuring six others
and a teacher.

about the number of students who transferred to Kerr Elementary from Oxford, nor any details regarding the "counseling and social work support to deal with the trauma" they were receiving as grade-schoolers due to the shooting at Oxford High. Nor did Leffel explain why she said nothing about Oxford the day she made C.S. remove her hat, or that evening.

In Defendants' summary judgment motion, they subtly yet significantly backtracked from Leffel's deposition claim that multiple Oxford students had come to *Kerr Elementary* and were receiving counseling, instead noting "*Durand Area Schools* had absorbed several students from Oxford Area School District who moved to the area following the school shooting." Brief, at 7–8, RE 17, Page ID ## 298–99 (citing Leffel Deposition, at 23-24) (emphasis added); *accord* Defs.' MSJ Response, at 8, 16–17, RE 19, Page ID ## 464, 472–73. In their brief's "argument" section, Defendants claimed "there were students *in the building* who had moved from Oxford whose friends, family or other people that they had known were just been involved [*sic*] in a devastating school shooting," but offered no record cite in support. Brief, at 14–15, RE 17, Page ID ## 305–06. Their other summary

judgment papers made no mention of Oxford.

In its ruling denying C.S.'s motion for summary judgment and granting Defendants, the district court cited Leffel's view that depictions of weapons are never appropriate, and her speculation that "come and take it" could be interpreted literally. But the district court gave the Oxford shooting attribution far beyond that claimed even by Defendants:

> As Leffel explained at her deposition, she believed a depiction of a gun could cause fear and disrupt the classroom environment—particularly if tests were being administered:
>
> > Well, other than the—we have students that attended—attended Robert Kerr that had moved from Oxford. And I had several conversations with their parents. And those students were receiving counseling and social work support to deal with the trauma. And so…with all the school shootings we have, it's a picture of an automatic weapon.… I think [wearing the hat] would—could disrupt the educational environment. So anything that is involved in that from class work, if they're taking a test that day, it could have impacted it if kids were uncomfortable.

District Court Opinion, at 6, RE 25, Page ID # 601 (citing Leffel Dep., Page ID ## 205–07) (highlighting added). The highlighted passage the court replaced with an ellipses is actually a gap of *two full transcript pages*. There is no reasonable reading of those three transcript pages

under which Leffel testified that Oxford-related trauma would "disrupt the educational environment." The court also cited the views of Leffel's successor, Tonya Klont, who did not become principal until months after Hat Day and had no role in the decision. Panel Opinion, at 10–11.

C.S. appealed, and on May 2, 2025, the panel issued its published opinion. Outdoing even the district court, the panel opinion's "Background" section opens not with the facts of *this* case, but with an extended discussion of the Oxford shooting and its aftermath. Opinion, at 2. It returns to that later, largely citing to news accounts and other extra-record material, including the district court's own extra-record observations. Panel Opinion, at 2 ("[T]his tragedy . . . traumatized many students in close proximity to the shooting and inflicted 'lasting scars' on Michigan schools[.]") (quoting Memorandum Opinion, at 27–28, 32). Indeed, the opinion cites to nothing but *the district court* when it says "[u]ndoubtedly, the record proves that 'the Oxford shooting was very close in time and space,'" a "striking closeness" that "lends context to the School's apprehensions about Plaintiff's Hat disrupting the student environment." Panel Opinion, at 9 (quoting District Court Opinion, at 32).

The panel also ascribes to school officials "the unique challenge of educating and supporting students who fled the Oxford School District after the Oxford Shooting and relocated to Robert Kerr for their emotional and physical safety." *Id*. It cites Leffel's supposed "firsthand knowledge of these students' struggles" as "inform[ing] her belief that Plaintiff's Hat could cause a substantial disruption by compounding the students' existing feelings of fear and distress over school shootings," *id*. (citing Leffel Dep., RE 17-4, Page ID # 344)—even though she made no mention of Oxford on Hat Day. The opinion then directly bases its finding of "substantial disruption" under *Tinker* on the outsized role supposedly played by the Oxford shooting on defendants' thinking. Panel Opinion, at 6–9.

## SUMMARY OF ARGUMENT

The published panel opinion puts this Circuit at odds with both *Tinker* and with other circuits that have properly applied *Tinker* in the context of school discipline for message-conveying attire. On the summary judgment record construed in a light most favorable to C.S., as it must be, school officials based their decision only on their own subjective dislike of guns and on vague speculation about scuffling

schoolkids—plainly insufficient to meet their heavy burden under *Tinker* to show *specific and justifiable fear of specific disruption*. And by effectively abandoning Defendants' stated reasons in favor of their *post hoc* rationalizations based on a school shooting two counties away, the panel created an exception to *Tinker* that will swallow the rule and make this Circuit an outlier in student-speech jurisprudence.

## **ARGUMENT**

### **I.     The panel opinion contravenes *Tinker*.**

The panel correctly held that this matter is governed by *Tinker's* speech-protective standard. Panel Opinion, at 7–8 (citation and footnote omitted). But after citing that binding authority, the panel essentially disregarded it.

*Tinker* requires that for Defendants to meet their heavy burden of limiting student speech, there must be a showing that C.S.'s hat "would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 509 (citation omitted). "The rule of *Tinker* has come to mean that a school may not regulate student expression unless the regulation may be justified by a showing that the student's speech would materially and

substantially disrupt the work and discipline of the school." *Guiles v. Marineau*, 461 F.3d 320, 324–25 (2d Cir. 2006) (cleaned up) (quoting *Tinker*, 393 U.S. at 513); *accord Lowery v. Euverard*, 497 F.3d 584, 605 (6th Cir. 2007) (Gilman, J., concurring in the judgment).

Neither reason defendants gave on Hat Day meets their burden under *Tinker*. The panel's treatment of Leffel's stated concern about overly literal schoolkids being triggered to actually "come and take" C.S.'s hat highlights the depth of its error. To be sure, school officials may restrict student speech "when the facts *reasonably lead them* 'to forecast substantial disruption of or material interference with school activities.'" Panel Opinion, at 7 (emphasis added) (citing *Tinker*, 393 U.S. at 514). They need not wait for actual disruption, but "may intervene preemptively *when such facts exist*, because '*Tinker* does not require disruption to have actually occurred.'" *Id.* (emphasis added) (citing *Lowery*, 497 F.3d at 591–93).

But such facts *must exist*. Defendants offered no *facts* justifying preemptive intervention—simply Leffel's speculation that other kids might take the hat's message literally and try to "come and take it." This is precisely the sort of "undifferentiated fear or apprehension of

disturbance" that *Tinker* declared "is not enough to overcome the right to freedom of expression." 393 U.S. at 508. It also improperly imposes a heckler's veto. *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 234 (6th Cir. 2015) (en banc).

Leffel's other contemporaneous justification, her articulated dislike of weapons, is even weaker, and presents a textbook case of impermissible viewpoint discrimination. "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.")). Government disapproval of a subset of messages it finds offensive "is the essence of viewpoint discrimination." *Matal*, 582 U.S. at 249. At the summary judgment stage, facts must be construed most favorably to C.S. *Barr v. Lafon*, 588 F.3d 544, 561 (6th Cir. 2008) (citation omitted). Properly construed, neither concern that school officials actually cited on Hat

Day meets *Tinker*'s standard for reasonably forecasting the hat would "materially and substantially interfere with the requirements of appropriate discipline." *See Tinker*, 393 U.S. at 513.

Which leaves the Oxford shooting. A defendant's shifting explanations and change of factual positions can be evidence of pretext and a lack of credibility. *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996). Though the district court and panel relied heavily on the Oxford shooting and its fallout as a basis for forecasting substantial disruption, no decisionmaker cited it until nearly a year after telling C.S. to take off her hat. Even then, Leffel's unsupported deposition claim that students had fled the Oxford High School shooting to Kerr *Elementary* was walked back in Defendants' summary judgment papers. MSJ brief, at 7–8, RE 17, Page ID ## 298–99 ("*Durand Area Schools* had absorbed several students from Oxford Area School District who moved to the area following the school shooting.") (emphasis added). This is underscored by the heavy use both the district court and panel necessarily placed on news accounts and other extra-record material as support for post-Oxford trauma. Panel Opinion, at 1, 8 & nn.5, 9 & nn.6, 10, 15. On this summary judgment record, properly

construed, it simply cannot be said that defendants presented facts

sufficient to show they reasonably forecast *on Hat Day* that the hat

would "materially and substantially interfere with the requirements of

appropriate discipline."

The schoolchildren of this Circuit are as entitled to the protections

of the First Amendment, as articulated by *Tinker* and its progeny, as

are the rest of the Nation's. *En banc* rehearing is warranted. Fed. R.

App. P. 40(b)(2)(B).[2]

## II.    The opinion puts this Court in conflict other circuits' application of *Tinker*.

Rehearing *en banc* also is warranted under Federal Rule of

Appellate Procedure 40(b)(2)(C). By failing to heed *Tinker*, the panel

opinion puts this Circuit in sharp conflict with others that have shown

strict fidelity to that landmark school-speech ruling with regard to

---

[2] *Tinker*'s obvious applicability also requires reversal as to qualified immunity. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 787 (9th Cir. 2022) (summary judgment based on qualified immunity reversed where school principal forbade plaintiff from wearing his MAGA cap to teacher-training sessions; both plaintiff's right to express political views, and fact that controversial speech cannot be quelled because others find it objectionable, are clearly established) (citing *Tinker*); *accord Hatcher v. Fusco*, 570 F. App'x 874, 877 (11th Cir. 2014).

message-conveying student attire. *See, e.g.*, *Newsom*, 354 F.3d at 259–60 (middle-school student entitled to injunction barring enforcement of dress-code ban on "messages . . . that relate to . . . weapons" where there was no evidence that such clothing worn by students at school ever substantially disrupted school operations or interfered with others' rights, thus under *Tinker* student "has demonstrated a strong likelihood of success on the merits"); *N.J.*, 37 F.4th at 416 (reversing summary judgment for school administrators who used a dress code barring "inappropriate" attire to prevent middle-schoolers from wearing t-shirts with a picture of a gun, and remanding for application of *Tinker*).

No Defendant, on Hat Day (or within the next 10 months), presented anything beyond vague speculation about potential disruption from other children taking the hat's message literally and their personal dislike of firearm imagery. C.S.'s speech is quintessentially within the area that long has been protected by *Tinker* and its progeny, and this Circuit should protect it with the same fidelity as do those cited above.

**III.  The panel has created a new category of restricted student speech outside Supreme Court precedent, presenting a First Amendment issue of major importance.**

"*Tinker* establishes that public schools cannot confine students to the expression of those sentiments that are officially approved," since "school officials cannot suppress expressions of feelings with which they do not wish to contend." *L.M. v. Town of Middleborough*, 103 F.4th 854, 875 (1st Cir. 2024) (cleaned up) (citing *Tinker*, 393 U.S. at 511 and *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). Notwithstanding *Tinker*, the Supreme Court has recognized three specific categories of student speech schools may in certain circumstances regulate: "(1) indecent, lewd, or vulgar speech during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187–88 (2021) (cleaned up).

But *Tinker* "does not permit a 'hurt feelings' exception that any opinion that could cause 'offense' may trigger." *L.M.*, 103 F.4th at 875 (citing *Zamecnik v. Indian Prairie Sch. Dist. #204*, 636 F.3d 874, 877 (7th Cir. 2011)). "Otherwise, school authorities could do what *Tinker* clearly forbids: protect other students 'from the discomfort and

unpleasantness that *always* accompany an unpopular viewpoint.'" *Id*. (citing *Tinker*, 393 U.S. at 509).

In disregard of all that, the panel opinion effectively has recognized a new exception, covering images of weapons and speculation about emotional harm such images may cause to students under the unique facts of each case—something the Supreme Court has *never* countenanced. The panel drops a cautionary note, saying "we nowhere suggest that the generalized potential for students' discomfort, offense, or other psychological distress, *without more*, is enough for schools to ban speech on topics such as the Second Amendment." Opinion, at 14. But that is *exactly* the result the Opinion creates, since, as noted above, the "*more*" on which it relies—Hat Day concern for trauma to Kerr *Elementary* students from the Oxford *high school* shooting two counties away—is wholly unsupported by the properly construed record. Rather, it consists of assumptions about the likely effect of the shooting, as inferred by the district court and the panel opinion.

Rarely will there be a situation in which school officials, with the luxury of 10 months' time and consultations with counsel, fail to

articulate some *post hoc* justification for squelching student speech under the guise of protecting "children reeling from an irrefutably tragic and traumatic event." Opinion, at 15. Unless the Opinion is vacated and this case revisited *en banc*, this novel exception will quickly swallow the First Amendment rule.

## <u>CONCLUSION</u>

C.S. asks this Circuit to vacate the May 2, 2025, panel opinion and rehear this matter *en banc*.

Respectfully submitted,

JOHN MONROE LAW, P.C.

By: <u>/s/ John R. Monroe</u>
     John R. Monroe
156 Robert Jones Road
Dawsonville, GA  30534
(678) 362-7650
jrm@johnmonroelaw.com

and

THE SMITH APPELLATE LAW FIRM

By: <u>/s/ Michael F. Smith</u>
     Michael F. Smith
1717 Pennsylvania Ave. N.W.
Suite 1025
Washington, D.C.  20006
(202) 454-2860
smith@smithpllc.com

and

/s/ Eugene Volokh
Eugene Volokh
434 Galvez Mall
Stanford, CA 94305
(650) 721-5092
volokh@stanford.edu
**Counsel for Plaintiff-Appellant C.S.**

Dated: May 30, 2025

## **CERTIFICATE OF SERVICE**

This Petition was served upon counsel for Appellees by notice of electronic filing with the Sixth Circuit CM/ECF system.

/s/ John R. Monroe

## CERTIFICATE OF COMPLIANCE

    1.    This Petition complies with the word limit of Fed. R. App. P. 40(d)(3)(A) because, excluding the parts of the Petition exempted by Fed. R. App. P. 32(f), it contains 3,719 words.

    2.    This Petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Century Schoolbook, a proportionally spaced font with serifs, using Microsoft Word for Microsoft 365 MSO.

/s/ John R. Monroe

*Co-counsel for Plaintiff-Appellant C.S., by her next friend Adam Stroub*

Dated: May 30, 2025

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0112p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

C.S., by her next friend, Adam Stroub,

       *Plaintiff-Appellant*,

  *v*.

C<small>RAIG</small> M<small>C</small>C<small>RUMB</small>; A<small>MY</small> L<small>EFFEL</small>; M<small>ICHAEL</small> P<small>APANEK</small>,

       *Defendants-Appellees*.

No. 24-1364

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10993—Terrence George Berg, District Judge.

Argued: January 30, 2025

Decided and Filed: May 2, 2025

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Eugene Volokh, STANFORD UNIVERSITY, Stanford, California, for Appellant. Daniel J. LoBello, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellee. **ON BRIEF:** Eugene Volokh, STANFORD UNIVERSITY, Stanford, California, John R. Monroe, JOHN MONROE LAW, P.C., Dawsonville, Georgia, Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Appellant. Daniel J. LoBello, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

CLAY, Circuit Judge. Plaintiff C.S., by her father and next friend, Adam Stroub, appeals the district court's grant of summary judgment to Defendants Craig McCrumb, Amy Leffel, and

Michael Papanek in this First Amendment action under 42 U.S.C. § 1983.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The Oxford Shooting of 2021

On November 30, 2021, in Oakland County, Michigan, fifteen-year-old Ethan Crumbley opened fire on his classmates at Oxford High School in what would become "the deadliest high school shooting in Michigan history."  Stephanie Saul & Anna Betts, *Michigan Teenager Who Killed Four Students Is Sentenced to Life*, N.Y. TIMES (Dec. 8, 2023), https://www.nytimes.com/2023/12/08/us/michigan-oxford-school-shooting-sentencing.html. Armed with a nine-millimeter handgun, Crumbley shot and killed four people under the age of eighteen, and "severely injure[d]" seven others, including a teacher.  Order, R. 25, Page ID #622; *see People v. Crumbley*, 11 N.W. 3d 576, 580–87 (Mich. Ct. App. 2023) (detailing the events leading up to the shooting).  Communities in Oakland County and across Michigan were left reeling from this deadly attack, and the Oxford School District was bombarded with lawsuits brought by current high school students, their next friends, and the estates of the deceased.  *See, e.g., Franz v. Oxford Cmty. Sch. Dist.*, No. 21-cv-12871, 2024 WL 4326812 (E.D. Mich. Sept. 27, 2024).  Some families opted to change school districts[1] as result of this tragedy, which traumatized many students in close proximity to the shooting and inflicted "lasting scars" on Michigan schools.  Order, R. 25, Page ID #622–23, 627.  More than three years later, the impact of the Oxford Shooting "is still felt acutely state-wide."  *Id.*

### B.  Factual and Procedural History

Plaintiff C.S., a minor child, attended Robert Kerr Elementary School ("Robert Kerr" or "the School") in Durand, Michigan, of Shiawassee County, less than an hour's drive from the Oxford School District in Oakland County.  During the 2021–2022 school year, C.S. was enrolled in the third grade and had an Individualized Education Plan ("IEP").  On February 17, 2022, the school observed "Wear a Hat Day" as part of the "Great Kindness Challenge."  School

---

[1]The Oxford School District is a public school system located in Oakland County, Michigan, that consists of both elementary and secondary schools.

Newsletter, R. 17-9, Page ID #418. The Great Kindness Challenge was a weeklong initiative designed to encourage students "to complete as many acts of kindness as possible." *Id.* at Page ID #419. Some of the week's activities included "Kindness dress-up days," during which students could wear special clothing items to school and complete a "Great Kindness Challenge checklist." *See id.* On "Hat Day," students were allowed to wear a hat of their choosing throughout the day as an exception to the usual dress code policy, which only permitted hats to be worn during recess. *Id.* at Page ID #418; Handbook, 17-5, Page ID #364.

On the morning of Hat Day, C.S. arrived at school wearing a black baseball cap that displayed a white star, a white image of an AR-15-style rifle, and the capitalized phrase, "COME AND TAKE IT" ("the Hat"). Leffel Dep., R. 17-4, Page ID #342. C.S. chose to wear the Hat because it belonged to her father and "made [her] feel safe." C.S. Dep., R. 17-10, Page ID #424. At the School, Defendant Michael Papanek, who worked as the "On Track Coach" charged with administering discipline in the school, saw C.S. wearing the Hat and noticed that it depicted a gun. Papanek Dep., R. 15-2, Page ID #250–52. Papanek believed that the Hat may have been a violation of school policy and went to inform the Principal, Defendant Amy Leffel, to discuss what, if anything, should be done about the Hat. Based on Papanek's description of the Hat, Principal Leffel felt that the image of a firearm, combined with the phrase "Come And Take It," had the potential to incite an altercation between young children and disrupt the testing environment, and that some students may find it "threatening." Leffel Dep., R. 17-4, Page ID #342, 344–45.

Specifically, Leffel believed that the Hat could cause a disruption amongst students who had recently transferred to Robert Kerr from the Oxford School District as result of the Oxford Shooting on November 30, 2021, less than three months earlier, during which several students were killed or seriously injured. *See Crumbley*, 11 N.W. 3d at 579. Leffel knew that the students from the Oxford School District "were receiving counseling and social work support to deal with the trauma," after having "several conversations with [the students'] parents." Leffel Dep., R. 17-4, Page ID #344. She thought that the Hat could arouse fear in some of these students and that others "could perceive [the phrase "Come And Take It"] as a dare to try and take the hat off of [C.S.]." *Id.* Leffel also cited more generalized concerns that "[g]uns often

suggest violence," which she thought was inappropriate for an elementary school setting, citing the student handbook and "gun-free zone." *Id*. at Page ID #342. Defendant Craig McCrumb, superintendent of Durand Area Schools, was also present in Leffel's office during these deliberations over C.S.'s Hat.

After discussing their concerns regarding the Hat, Papanek and Leffel decided to call C.S.'s parents and ask them to bring her a substitute hat to wear. C.S.'s father, Adam Stroub, declined to do so. From there, Papanek and Leffel went to C.S.'s classroom, called her into the hallway, and asked her to remove the Hat and put it inside her locker. C.S. complied without issue.[2] In a subsequent email exchange between Leffel and Stroub, Leffel explained that the Hat was inappropriate for school because it depicted a weapon in contravention of the student handbook, and that "[w]eapons of any kind are not appropriate for students to wear in a school setting." Emails, R. 17-12, Page ID #436. The dress code stated in pertinent part: "Anything printed on clothing must not be offensive in any way. The building principal/staff has the right to decide what is offensive, but some examples are: words/slogans that advertise illegal substances, words/slogans that are racially or religiously offensive, violence themes, vulgar or sexual innuendo, etc." Handbook, R. 17-5, Page ID #364. In the email to Stroub, Leffel also referenced the handbook's mission to keep students safe and prevent distractions to "the learning atmosphere of the classroom." Emails, R. 17-12, Page ID #436.

On May 9, 2022, Plaintiff C.S., by her father Stroub, filed a lawsuit against Defendants Papanek, Leffel, and McCrumb ("school officials") under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments, and seeking declaratory and injunctive relief. Plaintiff moved for summary judgment on April 21, 2023, arguing that Defendants violated her First Amendment rights by asking her to remove the Hat, and Defendants filed a response. On April 24, 2023, Defendants filed their motion for summary judgment two days after the motion deadline set by the amended Case Management Order, arguing that the school was authorized to forbid the Hat under the circumstances in the record. Plaintiff moved to strike Defendants'

---

[2] The record does not indicate that C.S. experienced any anger, distress, or other negative emotions in response to school officials' request for her to remove the Hat.

motion as untimely.  The district court denied Plaintiff's motion but cautioned Defendants to ensure their compliance with all future deadlines.

On January 23, 2024, the district court heard oral argument on the parties' cross-motions for summary judgment.  Ultimately, the court denied Plaintiff's motion and granted summary judgment to Defendants.  The court credited Principal Leffel's determination that the Hat was inappropriate for the school setting and risked causing a substantial disruption in school activities.  In evaluating the reasonableness of this determination, the district court stressed that certain factors proved important, such as the presence of students who had transferred to Robert Kerr from the Oxford School District and were undergoing trauma therapy, and the young age of Plaintiff and her third-grade classmates.  This appeal followed.

## II.  DISCUSSION

### A.  Plaintiff's First Amendment Claim

This Court reviews *de novo* the district court's grant of summary judgment to school officials.  *Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008).  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "We view all evidence in the light most favorable to the nonmoving party."  *Barr*, 538 F.3d at 561 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 700 (6th Cir. 2007) (internal quotation marks omitted)).

Plaintiff C.S. argues that she was entitled to wear the "Come and Take It" Hat under *Tinker v. Des Moines Independent Community School District*.  *See* 393 U.S. 503, 506 (1969).  She contends that school officials did not have enough evidence to reasonably forecast that allowing the Hat to be worn in school would cause a "substantial disruption" in school activities under *Tinker*, and therefore lacked the authority to require its removal.  393 U.S. at 514.  Plaintiff characterizes her decision to wear the Hat as political speech aimed at showing personal support

for the Second Amendment.[3]  She also claims that the district court gave improper weight to her young age in declining to protect her expression in wearing the Hat.

Defendants respond to these arguments by citing concerns relating to the student population of Robert Kerr Elementary School, which consisted of children who had transferred from the Oxford School District after the widely publicized Oxford High School Shooting of 2021.  They argue that this special circumstance, combined with "the hat's provocative invitation to 'COME AND TAKE IT,'" led school officials to reasonably forecast a risk of substantial disruption under *Tinker*.  *See* Appellee Br., ECF No. 31, 11–13.  Further, Defendants claim that the district court properly accounted for Plaintiff's young age and the elementary school setting in concluding that her speech was not supported by the First Amendment.  Due to the factors at play, we hold that school officials did not act improperly or in violation of the First Amendment by asking C.S. to remove the Hat.

### 1. Constitutional Analysis

Central to this dispute is the Supreme Court's landmark ruling in *Tinker*, which protects the First Amendment rights of teachers and students in public school as long as their speech does not threaten to substantially disrupt or interfere with school activities.  *See* 393 U.S. at 506, 514.  In *Tinker*, three students aged thirteen to sixteen were suspended from school for wearing black armbands in protest of the Vietnam War.  393 U.S. at 504.  The Court described the students' symbolic act as "closely akin to 'pure speech'. . . entitled to comprehensive protection under the First Amendment."  *Id.* at 505–06.  Importantly, the Court found "no evidence" that the wearing of the armbands caused any interference whatsoever with school activities or the rights of other students, outside of a few "hostile remarks," and that the school officials were improperly motivated by the desire to avoid controversy.  *Id.* at 508–10 (stressing that the suppression of student speech must be "caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").  Because the school officials in *Tinker* "sought to punish [the students] for a silent, passive expression of opinion"

---

[3]This Court acknowledges Plaintiff C.S.'s "support for the right of people to have guns" as stated in her declaration; however, the record does not indicate that Plaintiff objected to school officials' request to remove the Hat or was otherwise upset by their request.  C.S. Decl., R. 20-1, Page ID #504.

that presented no reasonable threat of "any disorder or disturbance" in school activities, they infringed on the students' constitutional rights. *See id.* at 508.

*Tinker* also made clear that while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," these rights are not absolute. *See* 393 U.S. at 506; *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (noting that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings"). School officials may therefore restrict student speech when the facts reasonably lead them "to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514; *see also Lowery v. Euverard*, 497 F.3d 584, 591–93 (6th Cir. 2007) (clarifying that school officials may intervene preemptively when such facts exist, because "*Tinker* does not require disruption to have actually occurred"). Although the forecasted disruption must be substantial, it need not be violent. *Barr*, 538 F.3d at 566. *Tinker* also allows school officials to regulate speech "as part of a prescribed classroom exercise." 393 U.S. at 513.

Moreover, *Tinker* applies the First Amendment to student speech "in light of the special characteristics of the school environment," which may include such factors as the age and emotional maturity level of schoolchildren viewing the speech, particularly with respect to sensitive topics. 393 U.S. at 506; *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)). The Supreme Court's subsequent First Amendment cases inform us that schools may regulate student speech that is: (1) distractingly vulgar or lewd; (2) promotes illegal drug use; or (3) "bear[s] the imprimatur of the school." *See Fraser*, 478 U.S. at 685; *Morse v. Frederick*, 551 U.S. 393, 410 (2007); *Kuhlmeier*, 484 U.S. at 271–73. Because the present matter does not concern vulgar speech or illegal drug use, it is governed by *Kuhlmeier* or *Tinker*. Under *Kuhlmeier*, school officials' actions would likely have been permissible to the extent that Hat Day was considered "part of the school curriculum," but we analyze them instead under *Tinker*'s more speech-protective standard.[4] 484 U.S. at 270–71; *see Barr*, 538 F.3d at 564. Approaching the issue under *Tinker*

---

[4]The Great Kindness Challenge was a school-organized activity, including the dress-up days. R. 17-9, School Newsletter, Page ID #418–19. There is at least a colorable argument that C.S.'s speech "was made as part of school activities" and thus, that *Kuhlmeier*'s more school-friendly standard should apply. *Curry v. Hensiner*, 513 F.3d 570, 577–78 (6th Cir. 2008); *see Mahanoy*, 594 U.S. 187–88. *See n. 7, infra.* But because the Challenge was

means that school officials were authorized to prevent C.S. from wearing the Hat as long as the facts led them to reasonably forecast a "substantial disruption of or material interference with school activities." *See Tinker*, 393 U.S. at 514.

In the present case, this prediction was well-founded. Robert Kerr Elementary School had two key characteristics that Defendant school officials considered in asking Plaintiff to remove her Hat, and that underpin our analysis: first, the presence of transfer students who relocated from the Oxford School District after the Oxford Shooting, and second, the young age and emotional immaturity of elementary students in general. First, and perhaps most significantly, we consider the impact of the Oxford Shooting. Earlier in the 2021–2022 school year, four students were murdered at the Oxford High School in Oakland County, Michigan, by a fifteen-year-old shooter using a semi-automatic handgun. As Defendants note, this was a "well-known event" that spurred nationwide coverage and had a calamitous and long-lasting effect on the state of Michigan.[5] Appellees' Br., ECF No. 31, 11. Although the record below does not provide great detail on the Oxford Shooting or its aftermath, the event was publicized so extensively that the district court did "not . . . ignore [its] reality" in assessing Defendants' argument. Order, R. 25, Page ID #622. On top of the heightened impact of the Oxford Shooting on Michigan as a whole, we also consider its proximate impact on areas in southeast Michigan just miles away from the Oxford School District, and in the months immediately following the attack.

Indeed, the School's relationship to this massacre was both spatial and temporal. *See* Order, R. 25, Page ID #627 (noting that "'temporal factors and recent events' should be considered in evaluating whether school administrators *reasonably* anticipated . . . a substantial

---

not a supervised or required assignment or otherwise part of the curriculum, and the school administrators' contemporaneous justifications focused on disruption, we analyze their actions under *Tinker*. *See Kuhlmeier*, 484 U.S. at 271.

[5]For added context, the district court cited news coverage describing the Oxford Shooting and the criminal prosecution of its perpetrator. Livia Albeck-Ripka & Sophie Kasakove, *What We Know About the Michigan High School Shooting*, N.Y. TIMES (Dec. 9, 2021), https://www.nytimes.com/article/oxford-school-shooting-michigan.html. The district court further noted that "on the day [it] held oral argument in this case, the criminal trial for one of the parents of [Crumbley] commenced." Order, R. 25, Page ID #623. *See* Associated Press, *Michigan School Shooter's Mother to Stand Trial for Manslaughter in 4 Student Deaths*, U.S. NEWS (Jan. 23, 2024, 12:17 AM), https://www.usnews.com/news/best-states/michigan/articles/2024-01-23/michigan-school-shooters-mother-to-stand-trial-for-manslaughter-in-4-student-deaths.

interference" in school activities) (quoting *N.J. v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022)). Located in Durand, Michigan, the School is less than a one-hour drive from Oxford Township, Michigan, where the Oxford Shooting occurred, and four students lost their lives. The shooting also transpired on November 30, 2021, less than three months before "Hat Day" on February 17, 2022, when third-grader C.S. wore the gun-themed Hat to school. Undoubtedly, the record proves that "the Oxford shooting was very close in both time and space." Order, R. 25, Page ID #627. This striking closeness lends context to the School's apprehensions about Plaintiff's Hat disrupting the student environment.

In addition, school officials had the unique challenge of educating and supporting students who fled the Oxford School District after the Oxford Shooting and relocated to Robert Kerr for their emotional and physical safety. Principal Leffel knew that these students were actively "receiving counseling and social work support to deal with the trauma" of the Oxford Shooting. Leffel Dep., R. 17-4, Page ID #344. Leffel also had firsthand knowledge of these students' struggles after engaging in "several conversations with their parents," which informed her belief that Plaintiff's Hat could cause a substantial disruption by compounding the students' existing feelings of fear and distress over school shootings. *See id.* Principal Leffel's testimony about the students' trauma is well-taken, and substantiated by media reports that were pervasive at the time.[6] Surely it was reasonable for Leffel to perceive a risk that Plaintiff's Hat, sporting an image of an AR-15-style weapon, could cause traumatized children to become increasingly fearful about school shootings in a way that might cause a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.

---

[6]In addition to testimony in the record, several media reports conveyed the trauma and fear experienced by students attending school in the Oxford School District after the 2021 shooting. *See, e.g.*, Koby Levin & Ethan Bakuli, *Oxford High School Shooting Trauma: How Michigan Families Can Get Help*, DETROIT FREE PRESS (Dec. 3, 2021, 11:20 AM), https://www.freep.com/story/news/local/michigan/oakland/2021/12/03/oxford-high-school-shooting-trauma-resources/8851793002/; Keenan Smith, *How to Help Your Kids Deal With Grief, Trauma After the Oxford High School Shooting*, WXYZ DETROIT (Dec. 9, 2021, 6:59 AM), https://www.wxyz.com/news/oxford-school-shooting/how-to-help-your-kids-deal-with-grief-trauma-after-the-oxford-high-school-shooting; Tiarra Braddock, *Mother of Oxford High School Student Shares How Her Family Has Coped With 2021 Shooting*, WXYZ DETROIT (Nov. 30, 2023, 6:09 PM), https://www.wxyz.com/news/oxford-school-shooting/mother-of-oxford-high-school-student-shares-how-her-family-has-coped-with-2021-shooting.

Plaintiff seeks to rely on *Schoenecker v. Koopman*, a decision from the Eastern District of Wisconsin, in arguing that students' generalized fear of gun violence and school shootings is not enough to suppress gun-related speech in schools.  349 F. Supp. 3d 745, 748, 754 (E.D. Wis. 2018).  While true in theory, Plaintiff's argument glosses over the sizeable contrast between the facts in *Schoenecker* and those in the instant case.  In *Schoenecker*, a high school student from Wisconsin wore T-shirts to school that "made some of the teachers . . . uncomfortable" because of their depiction of weapons stylized to spell out phrases such as "Celebrate Diversity" and "Love." *Id.* at 747–48.  The staff members cited students' "general" concerns about experiencing a school shooting, because of the recent school shooting in Parkland, Florida, as well as the fact that some students at the school had "participated in a walkout to protest school gun violence and to remember the 17 victims killed in the Parkland shooting." *Id.* at 753.

The *Schoenecker* court was unpersuaded by these points and found no relationship between the Florida shooting and the Wisconsin student's T-shirts, which did not result in a substantial disruption at the Wisconsin school and could not reasonably be forecasted to do so. *See id.* at 752–54.  By contrast, school officials in the present matter relied on their knowledge of Robert Kerr's "special characteristics" and student body in making such a prediction. *Tinker*, 393 U.S. at 506.  Specifically, they knew that a group of young students from the Oxford School District had transferred to Robert Kerr because of the Oxford Shooting earlier that academic year and were suffering from trauma.  Given the emotional vulnerability and age of the students, the School's decision to require C.S. to remove the Hat for its depiction of an AR-15-style weapon, in anticipation that it could "trigger emotional and fear-based responses" in children, was "reasonably related to the legitimate pedagogical objective of preventing school and classroom disturbances before they occurred."[7]  Order, R. 25, Page ID #628.

---

[7]We also recognize *Tinker*'s allowance for speech restrictions "as part of a prescribed classroom exercise," 393 U.S. at 513, and that the School's "Great Kindness Challenge" was meant to promote a "culture of kindness and compassion in [the] school."  School Newsletter, R. 17-9, Page ID #419; *see Kuhlmeier*, 484 U.S. at 271.  While *Tinker* broadly stands for the speech rights of students in public school, these rights may be limited to "maintain[] the focus of the class on the assignment in question." *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995).

No. 24-1364                     *C.S. v. McCrumb, et al.*                     Page 11

Clearly, there is a distinction between the generalized fear of school shootings in *Schoenecker* versus the potential for very *particularized* fears in the instant case. At Robert Kerr, school officials did not base their forecast of a substantial disruption on an out-of-state or other remote shooting; they were concerned about inflaming the effects of a recent, local shooting—in Michigan and less than one hour away—that had a direct impact on a portion of the student body. These students were actively undergoing counseling "to deal with the trauma" surrounding the Oxford Shooting, an event that brought death and serious injury to members of their community—while inflicting fear, shock, and sadness onto many others. *See* Leffel Dep., R. 17-4, Page ID #344. These conditions were manifestly more serious than the generalized fears expressed by staff members in *Schoenecker* and thus contributed to the School's reasonable forecast of a substantial disruption. *See* 349 F. Supp. 3d at 753.

*Schoenecker* is further distinguishable because of the language on the student's T-shirts, which displayed arguably tongue-in-cheek phrases such as "Love" and "Celebrate Diversity" spelled out using firearms. 349 F. Supp. 3d at 747–48. These phrases do not have the same provocative tone as Plaintiff's "Come And Take It" Hat, which the School interpreted as "threatening" and "trying to incite someone to come and have an altercation to take the weapon," or even the Hat itself. *See* Leffel Dep., R. 17-4, Page ID #342, 344. This view is understandable given the School's student body, comprised of traumatized and elementary-aged children, who may be more likely to react strongly or "impetuous[ly]" to depictions of AR-15-style weapons. *See id.* at Page ID #344.

Likewise, we also consider the young age of Plaintiff and her classmates in assessing the School's decision to request removal of the Hat, since the dynamics in an elementary school are markedly different from those in a high school. While children mature at different ages, it remains true that the issues sensitive to teenagers are not the same as those sensitive to children under ten years of age. *See Kuhlmeier*, 484 U.S. at 272. For instance, much of the speech on dating or sexuality may be acceptable or even advisable discourse in high school, yet unfit for students under ten years of age. *See id.* Similarly, the existence of Santa Claus or the Tooth Fairy may be a sensitive issue for young children that merits some discretion in an elementary school setting but is largely irrelevant for teenagers. *See id.* School officials may thus account

for the significant emotional and developmental limitations of young students in deciding what speech to permit, insofar as "potentially sensitive topics" are concerned. *Id.* Naturally, student speech centered on guns and other violent themes embodies this category.

We must therefore account for the age and relative emotional immaturity of Plaintiff's classmates. Robert Kerr Elementary is a school for students in the second to the fifth grades, corresponding generally with the ages of seven through ten. As Plaintiff was in the third grade, she and most of her classmates were presumably aged eight, or close to it, which is many years younger than most student plaintiffs in the case law governing student speech. *Tinker* primarily concerned high school students wearing armbands to protest the Vietnam War who, at fifteen and sixteen years of age, were nearly twice the age of eight-year-old C.S. 393 U.S. at 504. The youngest plaintiff in *Tinker*, a thirteen-year-old in junior high, was still considerably older than C.S. and her third-grade classmates. *Id.*

Plaintiff relies on decisions from the Fourth and Seventh Circuits for guidance on gun-related speech in schools, both of which feature students several years older than C.S. *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 252 (4th Cir. 2003) (protecting the speech rights of a twelve-year-old student who wore a T-shirt depicting the acronym "NRA" alongside a graphic of individuals aiming firearms); *Sonnabend*, 37 F.4th at 417, 427 (remanding for further proceedings consistent with *Tinker* when a high-school sophomore wore a T-shirt depicting a handgun); *see also Schoenecker*, 349 F. Supp. 3d at 754 (protecting a high school freshman's right to wear gun-themed shirts). While parts of our analysis might be different had C.S. been in high school or even junior high school, this Court is faced with the reality that C.S. and her classmates were elementary-aged children in the third grade.

Plaintiff correctly notes that elementary students enjoy at least some free speech protections,[8] *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 120 (2001), but the decision to tolerate speech on sensitive matters must be made in light of "the emotional maturity of the

---

[8]We further observe many significant differences between this case and *Good News Club*, which analyzed the speech issue as viewpoint discrimination in a limited public forum, concerned a Christian club seeking to meet at school after school hours, and discussed neither *Tinker* nor disruptions in instruction or regular school activities. 533 U.S. at 102, 105.

intended audience." *Kuhlmeier*, 484 U.S. at 272. Even the Seventh Circuit's decision in *Sonnabend*, cited in Plaintiff's appellate brief, supports this notion: "The application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of the school or student body in question." 37 F.4th at 426 (citation omitted). This is for good reason.

In the present matter, the particularly young age of C.S. and her classmates gives weight to Defendants' prediction that the Hat could cause a substantial disruption in school activities, since "[t]hese students are less mature and capable of [reining] in emotional outbursts than junior high or high schoolers." Order, R. 25, Page ID #628. This concern was intensified by the provocative nature of the Hat's phrase "Come And Take It," which Principal Leffel judged problematic around "young kids who can be very impetuous and could perceive [the phrase] as a dare to try and take the hat off of [C.S.]" *See* Leffel Dep., R. 17-4, Page ID #344. Due to the presence of very young children, coupled with students who were already suffering emotional trauma from the local and very recent Oxford Shooting, Leffel and other school officials reasonably forecasted a risk of substantial disruption when they asked C.S. to remove her Hat. *Id.* at Page ID #344.

Plaintiff's brief on appeal also cites to the design of the Michigan Great Seal and Coat-of-Arms,[9] which shows a man beside a lake "with his right hand raised up and his left hand holding a long gun," all pictured on a dark blue shield. *See* Appellant Br., ECF No. 30, 28. The shield is framed by the more prominent images of an elk, a moose, and a bald eagle, with the Latin word "Tuebor" written across the top, meaning "I Will Defend." *See id.*; STATE SYMBOLS USA, https://statesymbolsusa.org/symbol-official-item/michigan/state-seal/seal-michigan (last visited Mar. 26, 2025). Because the Michigan Coat-of-Arms features a weapon, Plaintiff argues that the School's decision to restrict the AR-15-themed Hat would also proscribe clothing items depicting the state seal and flag. *See* Appellant Br., ECF No. 30, 27–28. Notwithstanding the hypothetical nature of this point, we disagree that such a result follows logically from the

---

[9]Plaintiff cites to an informational page on the Michigan State Seal which defines the Latin phrases on the design and states that "Michigan's Coat of Arms was inspired by the 17th Century coat of arms of the Hudson's Bay Company, one of the earliest and largest fur-trading companies in North America." STATE SYMBOLS USA, https://statesymbolsusa.org/symbol-official-item/michigan/state-seal/seal-michigan (last visited Mar. 26, 2025).

No. 24-1364                     *C.S. v. McCrumb, et al.*                     Page 14

School's decision to restrict the Hat, because other restrictions on student expression would still be subject to *Tinker*'s substantial disruption standard. 393 U.S. at 514. On this point, we note the modest or even ambiguous nature of the long gun on the state seal and flag, and the benign appearance of the man holding it, which unlike Plaintiff's Hat, does not emphasize the gun's presence or tempt anyone to "Come And Take It." *See* Leffel Dep., R. 17-4, Page ID #344.

Plaintiff's comparison also assumes that the modest depiction of a man holding a hunting rifle outdoors, as seen on the state seal and flag, would carry the same risk of a substantial disruption or material interference in school activities as the Hat's prominent display of an AR-15-style weapon. *Tinker*, 393 U.S. at 514. There is a clear difference between these two portrayals, especially in light of the upsurge in school shootings carried out using AR-15-style weapons, and the potential for young children to have an acute response after surviving, witnessing, or otherwise feeling the front-row impact of such tragedy. *See* Leffel Dep., R. 17-4, Page ID #344; *see Staples v. United States*, 511 U.S. 600, 603 (1994) (describing the AR-15 as "the civilian version of the military's M-16 rifle"). Given the Hat's graphic and slogan, school officials made a reasonable forecast of a substantial disruption based on its provocative nature and "picture of an automatic weapon," which both stood to worsen the students' shooting-related trauma. Leffel Dep., R. 17-4, Page ID #344.

As a word of caution, we nowhere suggest that the generalized potential for students' discomfort, offense, or other psychological distress, *without more*, is enough for schools to ban speech on topics such as the Second Amendment. The record must show the existence of facts allowing school officials to reasonably forecast a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. To be sure, "political speech [is] at the core of what the First Amendment is designed to protect," *Virginia v. Black*, 538 U.S. 343, 365 (2003), and courts must be vigilant in safeguarding student expression in schools. But we must also account for the difficult jobs of school administrators and educators in maintaining a school environment that is, above all, conducive to learning for all of its students. Schools are under no obligation to tolerate speech that frustrates this goal or runs the reasonable risk of doing so. *See Tinker*, 393 U.S. at 514. This is especially true when young children engage with

sensitive topics, *Kuhlmeier*, 484 U.S. at 272, and is ever more compelling in the face of children reeling from an irrefutably tragic and traumatic event.

As Defendants acknowledge, this is a fact-driven case. The district court's analysis, as well as our own, "might have been different if the Oxford tragedy had not occurred, if it had not occurred less than an hour's drive from Durand Area Schools, or if students from Oxford had not transferred into the District," as well as "if C.S. was in high school as opposed to third grade." Appellees' Br., ECF No. 31, 12. As it stands, however, these facts support our conclusion that Defendants' actions were readily defensible. The record demonstrates that school officials relied on their knowledge of the student body to make a reasonable forecast of a substantial disruption in school activities, and therefore did not violate the First Amendment by asking C.S. to remove her Hat. *See Tinker*, 393 U.S. at 506.

## 2. Qualified Immunity

Defendant school officials argue that the case against them is precluded by the doctrine of qualified immunity because "no prior case law clearly established that restricting firearm imagery in this context was unconstitutional." Appellees' Br., ECF No. 31, 21. This Court uses a two-prong test to evaluate whether qualified immunity may shield a government official from trial. *Lowery*, 497 F.3d at 587. First, we determine whether the official's conduct violated a constitutional right. *Id.* If the answer is yes, we proceed to determine whether the right was clearly established at the time of the violation. *Id.* We need only resolve "one of the two inquiries" in Defendants' favor to grant them summary judgment. *McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Because school officials acted on the reasonable belief that Plaintiff's Hat could cause a substantial disruption in school activities, their actions did not run afoul of *Tinker* or offend the Constitution as required by the first prong of this test. 393 U.S. at 514. This ends our analysis on qualified immunity, and we need not proceed to the second prong. *McElhaney*, 81 F.4th at 556. Even assuming, for argument's sake, that a constitutional violation occurred, school officials would still be shielded from trial because it was not clearly established in 2022 that students may wear gun or weapon-themed clothing to school, particularly under the novel

circumstances of this case.  In consideration of the above, we affirm the district court's grant of summary judgment to Defendant school officials.

## B.  Defendants' Motion For Summary Judgment

Plaintiff argues that the district court improperly considered Defendants' untimely motion for summary judgment that they submitted on April 24, 2023, two days past the filing deadline of April 22, 2023, as set by the court's scheduling order.  Plaintiff then filed a motion to strike Defendants' motion as untimely, which the district court denied.[10]  In acknowledgement of their own untimeliness, Defendants' attribute the mistake to a misinterpretation of Rule 6(a) read in conjunction with the local rules, explaining that they believed they were permitted to file on April 24, 2023, a Monday, since the original deadline of April 22, 2023, fell on a Saturday.  We affirm the district court's decision to accept and consider Defendants' untimely motion.

"[A] district court's decision to amend its scheduling order to allow a late filing" is reviewed for an abuse of discretion.  *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (noting that a late motion may be properly construed by the district court "as a request to modify the scheduling order").  Similarly, this Court reviews "the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned."  *Collazos-Cruz v. United States*, 117 F.3d 1420, *2 (table) (6th Cir. 1997) (per curiam).  "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or when it employs an erroneous legal standard."  *Andretti*, 426 F.3d at 830 (quoting *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004)).

---

[10]Under Rule 12(f), courts may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Considered a drastic remedy, "[m]otions to strike are viewed with disfavor and are not frequently granted."  *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *see also Oppenheimer v. City of Madeira*, 336 F.R.D. 559, 566 (S.D. Ohio 2020) (noting that there typically "must be evidence that the moving party has been prejudiced" for a motion to strike to be granted).  Plaintiff's motion to strike Defendant's motion for summary judgment, a non-pleading, is not governed by Rule 12(f), and she provides no other procedural basis for her motion; nonetheless, she argues that the district court should have rejected Defendants' motion for being untimely pursuant to this Court's interpretation of Rule 6(a).

No. 24-1364                          *C.S. v. McCrumb, et al.*                          Page 17

"This Court follows the general principle that 'a district court has broad discretion to manage its docket.'" *Franke v. Norfolk S. Ry. Co.*, No. 21-3848, 2023 WL 3413919, at *3 (6th Cir. May 12, 2023) (citing *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 451 (6th Cir. 2010)). After a deadline expires, we may extend it "for good cause . . . if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). This entails an analysis of five factors, including:

> (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

*Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

In the present matter, Plaintiff has not shown that any prejudice resulted from Defendants' two-day delay in submitting their motion for summary judgment, which weighs against rejecting Defendants' motion on that basis. Because the delay was only two weekend days, it can hardly be argued that this slip had any impact on judicial proceedings. *See Varsity Brands, Inc. v. Star Athletica, LLC*, No. 10-2508, 2012 WL 2368436, at *3 (W.D. Tenn. June 21, 2012) (denying a plaintiff's motion to strike in connection with a defendant's late filing because "the length of the delay was just one day," and "had an extremely minimal, if any, impact on th[e] proceedings"); *see also Oppenheimer*, 336 F.R.D. at 566 (noting that "untimeliness alone is not enough to grant a motion to strike an answer").

On appeal, Defendants explain that this oversight was due to a misunderstanding of Rule 6, which caused them to interpret a later deadline than that prescribed by the Case Management Order. While Defendants could have exercised greater diligence in interpreting the rules, we do not find that they acted in bad faith, and the balance of factors tilts in their favor. Additionally, other courts have wielded their discretion to permit untimely summary judgment motions. *See D.B. v. Lafon*, No. 3:06-CV-75, 2007 WL 896135, at *3 (E.D. Tenn. Mar. 22, 2007); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 827744, at *3 (M.D. Tenn. Mar. 3, 2016). Thus, we hold that the district court did not abuse its discretion in denying Plaintiff's motion to strike and proceeding to consider Defendants' untimely motion for summary judgment.

## III. CONCLUSION

In consideration of Robert Kerr Elementary School's "special characteristics" and circumstances, such as its absorption of students from the Oxford School District and the especially young age of Plaintiff and her classmates, combined with the Hat's provocative message, school officials made a reasonable forecast of substantial disruption to the school's educational environment, *Tinker*, 393 U.S. at 514, and did not violate Plaintiff C.S.'s First Amendment rights by asking her to remove her Hat. The district court also did not abuse its discretion by considering Defendants' untimely motion for summary judgment. For the reasons set forth above, we **AFFIRM** the district court's order in full.